IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WMH TOOL GROUP, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| WOODSTOCK INTERNATIONAL, INC., and GRIZZLY INDUSTRIAL, INC., | ) | Civil Action No. 07C 3885 |
| Defendants. | ) | The Honorable John W. Darrah |
| WOODSTOCK INTERNATIONAL, INC., and GRIZZLY INDUSTRIAL, INC., | ) | Magistrate Judge Michael T. Mason |
| Counter-Plaintiffs, | ) | **[PUBLIC (REDACTED) VERSION]** |
| v. | ) | |
| WMH TOOL GROUP, INC., | ) | |
| Counter-Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF WMH'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Dated: September 9, 2009

Respectfully submitted,

s/ Steven C. Schroer
Steven C. Schroer
Edward E. Clair
Christine A. Pompa
Shane Delsman
FITCH, EVEN, TABIN & FLANNERY
120 South LaSalle Street
Suite 1600
Chicago, Illinois 60603-3406
Telephone:    (312) 577-7000

*Attorneys for Plaintiff, WMH TOOL GROUP, INC.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

TABLE OF ABBREVIATIONS ......................................................................... vi

Exhibit 4.6 (WMH300635.000131) to LaRocco Declaration (8/3/09) .......................vii

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

STATEMENT OF THE FACTS ...............................................................................2

I.      THE PARTIES ...........................................................................................2

II.     WMH'S JET WHITE TRADEMARK ...............................................................2

III.    PROCEEDINGS BEFORE THE PTO ...............................................................3

IV.     THE UNITED STATES CUSTOMS AND BORDER PATROL .................................5

V.      WMH'S EFFORTS TO ENFORCE ITS MARK AGAINST DEFENDANTS................6

VI.     THE INSTANT LITIGATION .........................................................................7

ARGUMENT ....................................................................................................8

I.      BECAUSE THE DEFENDANTS HAVE NOT ADEQUATELY PLED AND CANNOT
        PROVE INTENT, THEIR FRAUD DEFENSES AND COUNTERCLAIMS MUST BE
        DISMISSED ...............................................................................................8

        A.      Defendants Fail To Adequately Plead Or Prove An Intent To Deceive The
                PTO Regarding The Listing Of Goods .........................................10

        B.      Defendants Fail To Adequately Plead Or Prove An Intent To Deceive The
                PTO Regarding Third Party Uses................................................10

        C.      Defendants Fail To Adequately Plead Or Prove An Intent To Deceive The
                PTO Regarding The Date Of First Use .......................................11

II.     NOERR-PENNINGTON IMMUNITY APPLIES TO WMH'S ACTIONS AND
        DEFENDANTS' COUNTERCLAIMS SEEKING DAMAGES MUST BE DISMISSED .................12

        A.      Noerr-Pennington Immunity ...................................................12

        B.      Limited Exceptions To Noerr-Pennington Immunity.......................13

i

C.    *Noerr-Pennington* Immunizes WMH As A Matter Of Law From Liability For Damages Resulting From CBP's Enforcement Activities .........................14

D.    No Exception Applies To Deprive WMH Of Its *Noerr-Pennington* Immunity.................................................................................................14

CONCLUSION .......................................................................................................15

# TABLE OF AUTHORITIES

**Page**

## Cases

*3M Co. v. Intertape Polymer Group, Inc.,*
423 F. Supp. 2d 958 (D. Minn. 2006) ........................................................ 9

*AmeriMax Real Estate Partners v. Re/Max Int'l Inc.,*
83 U.S.P.Q. 2d 1752 (N.D. Ill. 2006) ................................................... 13, 14

*Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.,*
522 F.3d 1200 (11th Cir. 2008) ............................................................... 11

*Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.,*
185 F.3d 154 (3d Cir. 1999) ..................................................................... 13

*Aromatique, Inc. v. Gold Seal, Inc.,*
28 F.3d 863 (8th Cir. 1994) ....................................................................... 9

*Assigned Container Ship Claims, Inc. v. Am. President Lines, Ltd.,*
784 F.2d 1420 (9th Cir. 1986) .................................................................. 12

*Aveda Corp. v. Evita Mktg., Inc.,*
706 F. Supp. 1419 (D. Minn. 1989) ..................................................... 8, 12

*Barq's Inc. v. Barq's Beverages, Inc.,*
677 F. Supp. 449 (E.D. La. 1987) ............................................................. 12

*Burlington Indus. v. Dayco Corp.,*
849 F.2d 1418 (Fed. Cir. 1988) .................................................................. 8

*California Motor Transport Co. v. Trucking Unlimited,*
404 U.S. 508 (1972) .......................................................................... 12, 14

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .................................................................................. 8

*Cheminor Drugs Ltd. v. Ethyl Corp.,*
168 F.3d 119 (3d Cir. 1999) ............................................................... 12, 13

*Clorox Co. v. Inland Empire Wholesale Grocers, Inc.,*
874 F. Supp. 1065 (C.D. Cal. 1994) ................................................... 12, 14

*DeMart & Dougherty, Inc. v Chesebrough Pond's, Inc.,*
348 F. Supp. 1194 (N.D. Ill. 1972) ............................................................. 9

*DiLeo v. Ernst & Young,*
901 F.2d 624 (7th Cir. 1990) ..................................................................... 9

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) ............................................................................. 1, 12

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
2009 U.S. App. LEXIS 17311 (Fed. Cir. 2009) ...................................... 9, 10

*Frayne v. Chi. 2016,*
2009 U.S. Dist. LEXIS 1267 (N.D. Ill. 2009) ........................................... 13

*Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc.,*
2003 U.S. Dist. LEXIS 23018 (N.D. Ill 2003) ......................................... 11

*Hufsmith v. Weaver,*
817 F.2d 455 (8th Cir. 1987) ............................................................. 12, 13

*In Re Bose Corp.,*
2009 U.S. App. LEXIS 19658 (Fed. Cir. 2009) ......................................... 9

*Int'l Elec. Co v. Smith,*
  105 U.S.P.Q. 215 (N.D. Ill. 1955) ................................................................. 9
*Isaly Co. v. Kraft, Inc.,,*
  619 F. Supp. 983 (M.D. Fla. 1985) ............................................................... 12
*isp.net, LLC v. Qwest Commn's Int'l., Inc.,*
  2003 U.S. Dist. LEXIS 9076 (S.D. Ind. 2003) ............................................ 12
*King Auto., Inc. v. Speedy Muffler King, Inc.,*
  667 F.2d 1008 (CCPA 1981) .......................................................................... 9
*Kottle v. Nw. Kidney Centers,*
  146 F.3d 1056 (9th Cir. 1998) ................................................................. 14, 15
*L.D. Kichler Co. v. Davoil, Inc.,*
  192 F.3d 1349 (Fed. Cir. 1999) ................................................................... 11
*Lasalle Invs., Inc. v. Fajerstein,*
  2007 U.S. Dist. LEXIS 47308 (N.D. Ill. 2007) ............................................ 9
*Matsushita Elecs. Corp. v. Loral Corp.,*
  974 F. Supp. 345 (S.D.N.Y. 1997) ............................................................... 13
*Mercatus Group LLC v. Lake Forest Hosp.,*
  528 F. Supp. 2d 797 (N.D. Ill. 2007) ................................................ 13, 14, 15
*Metro Cable v. CATV of Rockford, Inc.,*
  516 F.2d 220 (7th Cir. 1975) ................................................................... 14, 15
*Metro Traffic Control, Inc. v. Shadow Network, Inc.,*
  104 F.3d 336 (Fed. Cir. 1997) ....................................................................... 9
*Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.,*
  576 F. Supp. 2d 868 (N.D. Ill. 2008) ....................................................... 9, 11
*Money Store v. Harriscorp Fin., Inc.,*
  689 F.2d 666 (7th Cir. 1982) ......................................................................... 9
*Murata Mfg. Co. v. Bel Fuse, Inc.,*
  2007 U.S. Dist. LEXIS 17224 (N.D. Ill. 2007) ............................................ 9
*New West, L.P. v. City of Joliet,*
  491 F.3d 717 (7th Cir. 2007) ....................................................................... 12
*Nordstrom Consulting Inc. v. M&S Techs., Inc.,*
  2008 U.S. Dist. LEXIS 17259 (N.D. Ill. 2008) ............................................. 8
*Pony Express Courier Corp. of Am. v. Pony Express Delivery Serv.,*
  872 F.2d 317 (9th Cir. 1989) ....................................................................... 12
*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc. (PRE),*
  508 U.S. 49 (1993) .......................................................................... 12, 13, 14
*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.,*
  401 F.3d 123 (3d Cir. 2005) ......................................................................... 13
*Thermos Co. v. Igloo Prods. Corp.,*
  1995 U.S. Dist. LEXIS 18382 (N.D. Ill. 1995) ....................................... 13, 14
*United Mine Workers v. Pennington,*
  381 U.S. 657 (1965) ................................................................................ 1, 12
*United States v. Brown,*
  79 F.3d 1499 (7th Cir. 1996) ......................................................................... 8
*V & V Food Prods., Inc. v. Cacique Cheese Co.,*
  683 F. Supp. 662 (N.D. Ill. 1988) ......................................................... 9, 14, 15
*Waldridge v. Am. Hoechst Corp.,*
  24 F.3d 918 (7th Cir. 1994) ........................................................................... 8

*Zemenco, Inc. v. Developers Diversified Realty Corp.*,
   2005 U.S. Dist. LEXIS 23011 (W.D. Pa. 2005) ............................................................... 12


**Other Authorities**

15 U.S.C. § 1114(1)(a) ........................................................................................................ 2
15 U.S.C. § 1115(a) .................................................................................................... 14, 15
19 U.S.C. § 1526 ................................................................................................................. 5
28 U.S.C. § 636(b) ............................................................................................................. 8
37 C.F.R. § 2.34(a)(1)(iii) ................................................................................................ 11
37 C.F.R. § 6.1 ................................................................................................................... 3
TMEP § 1401.02 ................................................................................................................ 3
TMEP § 903.09 ................................................................................................................ 11

## TABLE OF ABBREVIATIONS

Association of Woodworking & Furnishings Suppliers  …….…….…………….. "AWFS"

Defendant, Grizzly Industrial, Inc. ………………………………….…………...…….. "GI"

Defendant, Woodstock International, Inc. …………………………………......…..…"WI"

Defendants, collectively …………………………………...…..…… "WI/GI" or "Defendants"

Department of Homeland Security  ………………………………………...…….. "DHS"

General International …………………………………………………………… "General"

Plaintiff, WMH Tool Group, Inc. …………………………………….…...……...… "WMH"

Registration Number 2,893,180 ……………….. "the '180 registration" or "the '180 mark"

Temporary Restraining Order …………………………………………………… "TRO"

United States Patent and Trademark Office …………………………….……...…….... "PTO"

United States Customs and Border Patrol.………………………………….…...…. "CBP"

WMH's Local Rule 56.1 Statement …...……………….…....……….………… "WMH Fact"

# The Best *White*

With the 1999 introduction of the entire white woodworking line, JET is completing the last phase in a four-year plan to convert all JET equipment and tools to rich JET white:



*1996 International Manufacturing and Technology Show*

*1996 machine tool introduction packet*

*1996-1997 metalworking catalog*

*It's our birthday, but you get the presents!*

*1998 40th Anniversary ad*

*1999 JET premium pallet truck*

The beauty is in the **details.**

*1999 woodworking ad*

### Phase I — 1995-1997

Market research initiated in 1995 led to the introduction of JET's rich white machine tools at the 1996 International Manufacturing and Technology Show.

### Phase II — 1998

The second phase of JET's market-driven color conversion involved introducing select "limited edition" white woodworking tools to coincide with JET's 40th anniversary.

### Phase III — 1999

JET's entire woodworking line is converted to white, followed by the introduction of selected material handling products.

### INTRODUCTION AND SUMMARY OF ARGUMENT

Through decades of effort, WMH has successfully established itself in the metalworking and woodworking industries as a manufacturer of high quality and reasonably priced products. As the facing page—published in 1999—clearly shows, after WMH launched its first "JET" White machines in 1996, consumers in the relevant market quickly came to recognize WMH and its product line based upon its JET White trademark.

On March 6, 2003, WMH filed an application to register its JET White mark on the Federal Register. WMH complied with the PTO's requests for additional information regarding use of the color white by both WMH and others. The '180 registration issued on October 12, 2004. On July 10, 2007, WMH filed this lawsuit alleging infringement of the '180 registration by Defendants. Immediately thereafter, Defendants—no strangers to intellectual property litigation—asserted a litany of fraud allegations by way of affirmative defenses and counterclaims. Despite extensive discovery (more than 40 depositions), Defendants cannot come forward with any evidence that WMH acted with an intent to deceive the PTO, an issue on which they carry a clear-and-convincing evidentiary burden. Defendants' affirmative defenses and counterclaims asserting fraud must therefore be dismissed.

On July 19, 2007, CBP approached Defendants at the AWFS trade show, and advised them that CBP had determined that certain machines Defendants were displaying at AWFS were, in CBP's judgment, infringements of WMH's federally-registered trademark covering the use of the color white. Rather than wait until the show had concluded for the day, as CBP suggested, Defendants immediately removed nine models from the floor. However, a TRO was granted and the offending machines were back on the floor before AWFS re-opened the next morning. Thereafter, CBP temporarily detained some additional machines, but deferred further enforcement activity after the Court ruled in February 2008 that the issues should be resolved in this litigation.

Defendants have asserted multiple counterclaims alleging that CBP's actions and the brief absence of several machines from the AWFS floor caused millions of dollars of damages. All alleged damages **arise only from actions of CBP.** These damage claims must be dismissed as a matter of law. Damages resulting from CBP carrying out its statutory duties cannot be awarded against WMH by reason of an extensive body of caselaw establishing the *Noerr-Pennington* doctrine and related immunities. *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961).[1]

---

[1] Defendants' exaggerated damages claims also fail based on the flawed methodology used by their expert. Defendants rely entirely upon the opinions of G. William Kennedy to support their bloated ██████

1

STATEMENT OF THE FACTS

## I.  THE PARTIES

WMH has sold woodworking and metalworking machines since 1958. (WMH Fact ¶ 11). Both Defendants sell woodworking and metalworking machinery competitive to WMH. (*Id.* at ¶ 7). Defendants and WMH compete in a niche market which consists of woodworking and metalworking enthusiasts, hobbyists, and small-shop professionals. (*Id.*). WI, under the "Shop Fox" brand name, imports, advertises, and sells white woodworking and metalworking machines that are confusingly similar to WMH's registered trademark. GI also imports, advertises, and sells "white-looking" woodworking and metalworking machines that are allegedly "tan," but which are nevertheless confusingly similar to WMH's registered trademark due to the white appearance of the machines in print and internet marketing.[2] (*Id.* at ¶ 8).

Shiraz Balolia, Defendants' principal, has established a mini-conglomerate of businesses whose primary business plan is to knock off their successful competitors. (*See id.* at ¶ 9). The record reflects at least eight lawsuits and many other settled disputes arising from Defendants' copying. (*Id.* at ¶ 10). Not one civil action has resulted in judgment in Defendants' favor. (*Id.*).

## II.  WMH'S JET WHITE TRADEMARK

Prior to 1996, WMH undertook to upgrade the actual and perceived quality of its products. To publicize that corporate goal, and to establish a new, uniform image in the marketplace, WMH debuted its line of metalworking machines in a new "JET White" color in 1996. (*Id.* at ¶ 11). In 1998, WMH launched its woodworking machines in the same JET White color. (*Id.*). This uniform white color clearly differentiated the JET product line from the bland colors its competitors were predominantly using. (*Id.*).

Several years after establishing its JET White mark, on March 6, 2003, WMH applied to place the mark on the PTO's Principal Register. (*Id.* at ¶ 15). On October 12, 2004, WMH received the '180 mark for "the color white as applied to the exterior surfaces of the goods at the rectangular base thereof excluding the top surface, wheel and instrumentation." (*Id.* at ¶ 36).

Since 1998, WMH invested some $40 million in marketing and advertising its JET White products in trade publications, cooperative advertising with its dealers, catalogs, and trade shows. (*Id.*

---

damage claims. (WMH Fact ¶ 58). However, because Mr. Kennedy's opinions are inadmissible under Rule 702 and *Daubert*, Defendants should be precluded from relying upon them. WMH reserves its right to exclude Kennedy's opinions and to seek JMOL on this issue.

[2] GI's confusing advertising of white machines renders it liable for trademark infringement regardless of the actual color of its machines, as it is infringement to use a registered mark "in connection with the sale, offering for sale, distribution, or advertising of goods . . . " 15 U.S.C. § 1114(1)(a).

at ¶ 12). As a result, the color of JET's machinery has come to be widely recognized in the marketplace as "JET White." Aggregate sales of such machinery total close to $800 million. (*Id.*).

WMH has also diligently protected its trademark. (*Id.* at ¶ 13). WMH has enforced its rights in the color white against Menards, Wilke (Yorkcraft), House of Tools, Pro-Tech, and Tannewitz. (*Id.*). Each enforcement resulted in the termination of the infringer's use of a color white similar to JET White, and often an acknowledgement of the JET White trademark. (*Id.*). In addition, industry participants, customers, dealers, and experts recognize the JET White mark as indicating WMH as the source of the machinery. (*Id.* at ¶ 14.)

## III.    PROCEEDINGS BEFORE THE PTO

WMH's outside counsel, led by Mr. Edward Clair, filed and prepared the trademark application on behalf of WMH. (*Id.* at ¶ 16). The application was signed by Mr. Robert Romano, WMH's in-house counsel. (*Id.* at ¶ 17). Mr. Romano also submitted a declaration affirming that he believed that (a) WMH was entitled to use of the mark in commerce, (b) no other entity had a superior right to use the mark in commerce, and (c) all statements made in the application were true to the best of his knowledge. (*Id.*). Mr. Romano's declaration was based upon his own review of the application, his knowledge of the industry at that time, as well as his reliance on WMH employees who "would have been in the best position to know that information." (*Id.*).

The application included, among other things, a date of first use of May 15, 1996, and identified, *inter alia*, the following goods in International Class 7:[3]

> Consumer and industrial woodworking and metalworking equipment, namely power saws, bandsaws, chop saws, tablesaws, cabinet saws, arbors, planers, jointers, molders, jigs, shapers, mortisers, welders, grinders, routers, drills, drill presses, tapping presses, milling machines, feeders, lathes, shears, rotary machines, sanders, polishers, buffers, platform trucks, pallet trucks, dust collectors, air filtration systems, and coolant systems, and parts, fittings and accessories for all the aforesaid goods, namely tool tables, cabinets, stands, bases and covers.

(*Id.* at ¶ 19). This list of goods was drafted by Mr. Clair. (*Id.*). Scott Box, who had many years experience in the industry, approved the description of goods. (*Id.* at ¶ 20). Mr. Clair testified that "before submitting this use based application, I consulted and confirmed with the client use of the color white on the products identified." (*Id.* at ¶ 21).

---

[3] According to U.S. trademark practice, goods and services must be identified by the Class into which they fall under in the International Schedule of Classes of Goods and Services. *See* 37 C.F.R. § 6.1; TMEP § 1401.02. According to that schedule, most stationary power tools fall under International Class 7 and most hand tools fall under International Class 8. Although WMH initially filed its application setting forth goods from both International Classes 7 and 8, following the initial Office Action, to accommodate the Examiner's request, WMH narrowed its application to cover only goods (stationary power tools) in International Class 7.

In the initial Office Action, the PTO denied registration because of the concern that the mark was merely ornamental or functional and because the application covered goods in both International Classes 7 and 8. (*Id.* at ¶ 23). The Examiner requested that the applicant address the use of color "in the relevant industry." (*Id.* at ¶ 24). The Examiner also requested information on other uses of color by WMH on the same goods, and whether "competitors" produce the "same or similar goods" in the color white, or other colors. (*Id.* at ¶ 25). The Examiner further required that "[t]he applicant must delete International Class 08 from the application." (*Id.* at ¶ 24).

Upon receiving the Office Action, Mr. Clair consulted with WMH about the response. (*Id.* at ¶ 26). Mr. Clair asked for information regarding the use of color by competitors in the relevant industry. (*Id.*). Upon receiving Mr. Clair's request, WMH investigated and gathered the pertinent information. (*Id.* at ¶ 27). Mr. Romano testified that "typically, when requests are made, as I have come to learn in office actions, there may be various people within the company who know or have some information regarding the matters that are requested. Those people will be asked to provide the information" often directly to the requester. (*Id.*). Thus, WMH, through its routine practice, provided the requested and necessary documents to Mr. Clair, which in turn were ultimately attached to the Office Action Response filed with the PTO. (*Id.*).

WMH's Response, as requested by the Examiner, limited the application to goods in Class 7. Further, as agreed upon during a telephone conference between Mr. Clair and the Examiner, the description of the mark was amended and narrowed to be directed to the color white at "the rectangular base thereof." (*Id.* at ¶¶ 28-29). Also as requested by the Examiner, WMH narrowed the identification of goods by submitting the following amended description in place of the original:

> Woodworking and metalworking machines, namely, power saws, bandsaws, chop saws, tablesaws, cabinet saws, planers, jointers, molders, jigs, shapers, mortisers, grinders, routers, drills, drill presses, milling machines, lathes, shears, sanders, and structural parts thereof, sold as a complete unit in International Class 7.

(*Id.* at ¶ 29). Several goods lacking a rectangular base, and also those in goods in Class 8, were deleted to conform to the revision. (*Id.*).

The Response also addressed in detail the Examiner's concerns regarding functionality and ornamentality, and included supporting exhibits and the Declaration of Scott Box. (*Id.* at ¶ 30). To establish that color may be non-functional, Exhibit A provided examples of woodworking and metalworking machines displaying industry-standard colors. (*Id.* at ¶ 31). Exhibit A included advertisements of competitive manufacturers such as Defendant GI and General, both of which feature green bases. (*Id.*). Exhibit B to the Response further showed that color may be a source identifier on woodworking and metalworking tools. (*Id.* at ¶ 32). This and other evidence showed

4

the color white is capable of being a trademark both generally and in the power tool industry. (*Id.*).

WMH's Response did not include non-competitive use of the color white on all woodworking and metalworking machines because the Examiner had expressly and properly limited his request to the use of white by "competitors." Based upon the information known to WMH, it did not believe there were any "competitors" using the color white in WMH's market in a relevant way at that time. (*Id.* at ¶ 33). Specifically, while Mr. Box was aware of some incidental uses of white, he believed that they were (a) not competitors (largely due to price differences and WMH's niche market), (b) temporary and abandoned uses, for example promotional items in the market for a limited time, and/or (c) were only isolated items within a larger product line primarily consisting of non-white products. (*Id.* at ¶ 34). For instance, while Mr. Box recalled seeing Shop Fox products advertised, he had only seen one model in the actual marketplace (which had a black base). (*Id.*).

WMH's Response also contained evidence that the color white as used by WMH had acquired distinctiveness through its substantially exclusive use. (*Id.* at ¶ 35). Exhibit 4 to the Scott Box declaration showed that WMH advertisements prominently featured the JET White color. (*Id.*). The exhibit specifically stated that in 1999, "JET is completing the last phase in a four-year plan **to convert all JET equipment and tools to rich JET white.**" (*Id.*; *see* p. vii, *supra*) (emphasis added).

The Examiner found WMH's arguments and evidence persuasive, and on June 30, 2004, the PTO issued a Notice of Publication under 12(a) for the purpose of opposition. (*Id.* at ¶ 36). The statutory time period for opposition passed and on October 12, 2004, the '180 registration issued to WMH for its JET White mark. (*Id.*). Defendants (who themselves then had a trademark covering the color green) filed no opposition.

## IV. THE UNITED STATES CUSTOMS AND BORDER PATROL

CBP is an agency within DHS. (*Id.* at ¶ 37). CBP has authority under 19 U.S.C. § 1526 to "protect American trademark owners from unfair competition from foreign-sourced infringing articles." (*Id.*). To that end, CBP has by regulation established a two-tiered enforcement regime. (*Id.* at ¶ 38). Under the first tier, a trademark holder may record its trademark with CBP. (*Id.*). Recordation of a trademark entitles the trademark owner to protection from unauthorized imports under various regulatory provisions. (*Id.* at ¶ 39).

Trademark owners may then request that CBP collect and retain information pertaining to their trademark rights. (*Id.*). Under the second tier, or the "application process," a trademark owner may actively provide CBP with information of violative imports so that CBP may take enforcement action. (*Id.* at ¶ 38). Before doing so, CBP ascertains whether the trademark in question is recorded and the extent of protection to which the trademark is entitled. (*Id.* at ¶ 40). CBP then conducts its

own investigation to determine whether any of the alleged goods are in fact infringing. (*Id.*).

WMH's statutory privilege to work with CBP to protect its registered trademark provides the legal foundation for the *Noerr-Pennington* immunity addressed below.[4]

## V.   WMH'S EFFORTS TO ENFORCE ITS MARK AGAINST DEFENDANTS

WMH recorded the '180 mark with CBP on July 27, 2005. (*Id.* at ¶ 42). On May 16, 2007 (two months before the AWFS show in question), WMH petitioned CBP, requesting that CBP bar importation of certain metalworking and woodworking equipment manufactured and imported by Defendants that WMH believed infringed upon its trademark. (*Id.*). CBP did not automatically grant WMH's petition, but did open an investigation. (*Id.* at ¶ 43). In June 2007, WMH responded to CBP with legal and factual arguments in support of its petition, including arguments supporting the validity of color-based trademarks in the relevant market and the scope of its JET White mark. (*Id.*).

The same day WMH filed this lawsuit, WMH also demanded in writing that Mr. Balolia cease using WMH's mark and invited a negotiated settlement. (*Id.* at ¶ 44). Defendants refused. (*Id.*). Since the AWFS trade show was scheduled to take place from July 18 to July 21, 2007, WMH also contacted AWFS show management to try to resolve the matter amicably before the show's commencement. (*Id.* at ¶ 47). AWFS sent letters to Defendants on July 11 expressing hope of resolving this matter before the show started. (*Id.*). Exercising its statutory privilege, WMH also notified CBP of Defendants' intent to display their infringing machines at AWFS. (*Id.* at ¶ 48).

On July 19, 2007, CBP agent Thomas Kalmes approached representatives of Defendants. (*Id.* at ¶ 49). In private (the AWFS show manager's office), CBP informed Defendants that, after its own independent investigation, CBP deemed some of their white machines to be infringing and counterfeit. (*Id.*). CBP requested that Defendants voluntarily remove models of their equipment from the show floor, **but told them they could wait until after hours**. (*Id.*). When their attempts to dissuade CBP failed, Defendants indignantly insisted upon immediately removing eight WI products and one GI product from the show floor **during** show hours. (*Id.*). The voluntary detention was temporary, as Defendants obtained a TRO in this civil action later that same day. (*Id.* at ¶ 50). CBP released the equipment upon receiving notice of the TRO. (*Id.*). As a result, Defendants' few pieces of equipment were only off the trade show floor for a few hours during the afternoon of July 19th. (*Id.*). Obviously, if Defendants had done as Mr. Kalmes suggested and waited until after hours, due to the intervening TRO, the machines need never have been moved.

---

[4] Defendants' own counsel stresses the important benefits that are realized by enlisting CBP to protect one's trademark. Defendants' law firm notes that a "critical" step in maintaining trademark rights is to record it with CBP and to sometimes "work[] shoulder-to-shoulder with CBP to successfully detect and stop counterfeits." (*Id.* at ¶ 41).

WMH did not seek to disrupt the AWFS show or in any way cause damage to Defendants' reputation, but rather merely sought the enforcement of its registered trademark through legitimate means, including recordation and petition of CBP in accordance with CBP's statutory charge and its administrative directive. (*Id.* at ¶ 51).

After the AWFS show, Defendants' counsel submitted a lengthy written petition presenting detailed arguments as to why CBP should not consider their goods to infringe WMH's mark, and requesting that CBP decline to enforce WMH's mark. (*Id.* at ¶ 53). CBP stated that it would consider these arguments carefully in making its decision. (*Id.*).

At the same time, Defendants responded to WMH's complaint in this Court with a variety of defenses and counterclaims. (*Id.* at ¶ 45). Count VIII alleges that WMH's "actions resulted in the U.S. Customs seizure and detention of [Defendants'] products at the AWFS trade show in Las Vegas, July 18-21, 2007." (*Id.*). ███████████████████████████████████████ ████████████████████████████ (*Id.* at ¶ 58). No other alleged actions of WMH are alleged as a basis for this astronomical damage claim. (*Id.*).

## VI.    THE INSTANT LITIGATION

Ten of Defendants' affirmative defenses ("ADs") and counterclaims ("CCs") allege fraud on the PTO. (*Id.* at ¶ 46). Specifically, Defendants contend that WMH committed fraud by (1) falsely representing to the PTO that the mark was used on all goods listed in the identification of goods when it allegedly was not; (2) alleging a date of first use in 1996 on woodworking goods when it was not used on these goods until 1998; and (3) asserting substantially exclusive and continuous use when WMH allegedly knew or should have known that its use was not exclusive. (*Id.*).

On October 29, 2007, Defendants moved for a Preliminary Injunction regarding machines being detained by CBP. (*Id.* at ¶ 54). The Court's February 14, 2008 order noted that, "[a]t this stage of the proceedings, Defendants need only demonstrate that they have a 'better than negligible' chance of succeeding on the merits." (*Id.*). With this very low burden in mind, the Court granted Defendants' motion and ordered WMH to consent to the release of Defendants' detained machinery *pendente lite*. (*Id.*). Defendants have done business as usual since then.

After the close of discovery, Judge Mason ruled upon a motion by Defendants to compel the deposition of Mr. Clair. (*Id.* at ¶ 55). In their motion, Defendants alleged that the deposition was necessary as Mr. Clair had "unique knowledge of disputed facts related to the '180 Reg." (*Id.*). Defendants further alleged that WMH could not assert attorney-client privilege as to certain documents in part because the "crime-fraud exception" applied. (*Id.*).

In sum, after some 40 fact depositions, massive document production, and extensive written discovery, Defendants took their best shot at persuading Judge Mason that there was evidence of fraud.

In a thorough opinion following *in camera* review of privileged documents from Mr. Clair's files, Judge Mason concluded that **"there is simply no basis for this court to find that any of the communications were 'intended to facilitate or conceal the alleged crime or fraud.' "** (*Id.* at ¶¶ 56-57) (emphasis added). Thus, the court held that **"Defendants have not produced any independent evidence of an intent to deceive the PTO, or shown that WMH made material representations of fact that it knew or should have known to be false."** (*Id.* at ¶ 57) (emphasis added). Defendants acceded to this holding by not appealing.[5]

The parties are now at the summary judgment stage. Defendants carry the burden to come forth with admissible evidence sufficient to show that they might prove their fraud allegations at trial by *clear and convincing evidence*. The "better than negligible" standard no longer applies. Defendants cannot come forth with evidence sufficient to meet their burden.

ARGUMENT

**I. BECAUSE THE DEFENDANTS HAVE NOT ADEQUATELY PLED AND CANNOT PROVE INTENT, THEIR FRAUD DEFENSES AND COUNTERCLAIMS MUST BE DISMISSED[6]**

The Court must grant summary judgment in favor of WMH on all of Defendants' fraud allegations, and specifically, Defendants' ADs 1-3 and 8, and CCs I-III, IX-XI.

Summary judgment is mandatory against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Allegations of fraud are commonly disposed of on summary judgment. *See e.g., Nordstrom Consulting Inc. v. M&S Techs., Inc.*, 2008 U.S. Dist. LEXIS 17259, at *26 (N.D. Ill. 2008) (Darrah, J.) (granting summary judgment of no fraud).

The readiness to assert claims of fraud as a litigation strategy has long been considered a "plague." *Burlington Indus. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988); *see also Aveda Corp. v. Evita Mktg., Inc.*, 706 F. Supp. 1419, 1425 (D. Minn. 1989). In response to incessant, "specious"

---

[5] Defendants had the right to appeal Judge Mason's ruling under 28 U.S.C. § 636(b) but failed to do so. "It is well-established in this circuit . . . that 'failure to file objections with the district judge waives the right to appeal all issues, both factual and legal.'" *United States v. Brown*, 79 F.3d 1499, 1503 (7th Cir. 1996). Thus, Judge Mason's decision is the law of the case.

[6] Defendants further fail to prove other essential elements of their fraud claims which are not the subject of this motion including the falsity or materiality of any alleged misrepresentations.

charges of fraud in both patent and trademark cases, courts have repeatedly emphasized the need to plead fraud with particularity and to prove fraud by clear and convincing evidence. *In Re Bose Corp.*, 2009 U.S. App. LEXIS 19658, at *5 (Fed. Cir. 2009); *Exergen Corp. v. Wal-Mart Stores, Inc.,* 2009 U.S. App. LEXIS 17311, at *31-46 (Fed. Cir. 2009) (patent case; cites trademark authority as applicable to pleading refinements); *Metro Traffic Control, Inc. v. Shadow Network, Inc.,* 104 F.3d 336, 340 (Fed. Cir. 1997); *Murata Mfg. Co. v. Bel Fuse, Inc.,* 2007 U.S. Dist. LEXIS 17224, at *14 (N.D. Ill. 2007). This high evidentiary standard applies when fraud is asserted as a basis for either cancellation of a trademark registration or for damages from an alleged fraudulent registration. *Money Store v. Harriscorp Fin., Inc.,* 689 F.2d 666, 670 (7th Cir. 1982); *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.,* 576 F. Supp. 2d 868, 879 (N.D. Ill. 2008).

"Proof that false statements were made to, or that facts were withheld from, the PTO, however, is not enough to show fraud for purposes of canceling a mark because of a party's fraudulent conduct." *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 877 (8th Cir. 1994) (emphasis added). Rather, there must be a willful intent to mislead the PTO. *Id.* at 877-78. Evidence of an intent to deceive requires more than bare allegations that the trademark applicant "knew or should have known" that a particular fact was allegedly false. *3M Co. v. Intertape Polymer Group, Inc.,* 423 F. Supp. 2d 958, 962 (D. Minn. 2006). Rather, as the Federal Circuit reaffirmed less than two weeks ago, fraud must be proven "to the hilt", "mere negligence" is not enough, and a "willful intent to deceive" is required to find fraud. *Bose,* 2009 U.S. App. LEXIS 19568, at *5-14.[7] Defendants have pled and urged their fraud claims in this Court for over two years while insisting upon the applicability of an incorrect "should have known" standard, which was explicitly disapproved in *Bose. Id.* at *8-9.

A pleading that simply avers the elements of fraud without setting forth particular facts which form the basis of the allegation does not satisfy Rule 9(b). *Exergen,* 2009 U.S. App. LEXIS 17311, at *31-33. Rather, a party alleging fraud must explicitly, rather than impliedly, articulate the "who, what, where, when, and how" of the facts that support the fraud claim. *Id.* (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990)); *see King Auto., Inc. v. Speedy Muffler King, Inc.,* 667 F.2d 1008, 1010-11 (CCPA 1981); *Lasalle Invs., Inc. v. Fajerstein,* 2007 U.S. Dist. LEXIS 47308, at *16-20 (N.D. Ill. 2007) (Darrah, J.). Here, Defendants fail to plead or prove any facts specifying who the alleged third-parties selling white machines were that WMH allegedly should have disclosed; who at WMH

---

[7] As noted in *Bose,* several other circuits, including the Seventh Circuit, require an intent to deceive. 2009 U.S. App. LEXIS, at *6-7 (collecting cases); *see also Miyano,* 576 F. Supp. 2d at 879; *V & V Food Prods., Inc. v. Cacique Cheese Co.,* 683 F. Supp. 662, 666 (N.D. Ill. 1988); *DeMart & Dougherty, Inc. v Chesebrough Pond's, Inc.,* 348 F. Supp. 1194, 1197 (N.D. Ill. 1972); *Int'l Elec. Co v. Smith,* 105 U.S.P.Q. 215, 221 (N.D. Ill. 1955).

knew of any relevant alleged third-party uses; <u>how</u> any third-party uses not disclosed to the PTO were material misrepresentations; and <u>who</u> at WMH acted with, and <u>how</u> any alleged acts by WMH, show a deliberate intent to deceive the PTO. (WMH Fact ¶¶ 45-46). Rather, Defendants' pleadings simply set forth little more than the elements of fraud. As a result, Defendants' fraud claims must be dismissed. *See Exergen,* 2009 U.S. App. LEXIS 17311, at *31-46.

### A.     Defendants Fail To Adequately Plead Or Prove An Intent To Deceive The PTO Regarding The Listing Of Goods

The application's original listing of goods was based upon WMH's use of the JET White mark on the exterior surface of a range of products. (WMH Fact ¶ 19). WMH and its counsel believed that the JET White mark was in use on all of the goods in the listing. (*Id.* at ¶¶ 20-22). Mr. Box's testimony confirms WMH's good faith belief on the subject. (*Id.* at ¶ 20). Additionally, nothing indicates that WMH knew and deliberately concealed that its JET White mark was not used on all of the goods listed. (*See id.* at ¶¶ 56-57). Further, WMH followed the Examiner's direction to remove goods in Class 8. In so doing, WMH carefully limited the listing of goods to Class 7, and limited the description of the mark to conform to the Examiner's request, ultimately resulting in a narrower application. (*Id.* at ¶¶ 28-29). WMH's actions cannot remotely indicate an intent to deceive, but rather show WMH's good faith. There is nothing to indicate that WMH purposely included goods on which the mark was not used in order to secure greater rights than WMH deserved.

### B.     Defendants Fail To Adequately Plead Or Prove An Intent To Deceive The PTO Regarding Third Party Uses

Following typical protocol, the PTO's initial Office Action denied registration on various grounds. (*Id.* at ¶ 23). In its Response, WMH submitted evidence regarding the use of color by other woodworking and metalworking manufacturers. (*Id.* at ¶¶ 31-33). Neither WMH nor its counsel intentionally withheld any information regarding other companies, competitive or otherwise, when responding to the Action. (*Id.* at ¶ 27; *see also id.* at ¶¶ 56-57). Notably, the Examiner did <u>not</u> ask WMH to search for every use of white by every other manufacturer of metal- and woodworking machinery, but specifically limited his request to use of color as a mark "in the relevant industry" and use of white by "competitors" producing the "same or similar goods." (*Id.* at ¶¶ 24-25). WMH fairly interpreted and responded to these queries.

As Judge Mason held, Defendants cannot provide any evidence that WMH uncovered any pertinent information that was deliberately withheld, much less that any information was withheld from the PTO in a willful effort to deceive. No documents were submitted regarding "competitors'" use of the color white on the same or similar goods, because none were known to WMH at that time. Defendants have also failed to show that WMH believed that any of the alleged third-party

10

uses which they now cite were truly "competitive" or similar in form and function to WMH's products. (*Id.* at ¶ 33; *see also id.* at ¶¶ 55-57).

For example, Defendants have improperly attempted to exploit the fact that an advertisement by a competitor, Delta, which appeared in a trade journal in about 1998, was not disclosed some six years later in WMH's Response. But Scott Box cogently explained his personal knowledge and belief that the Delta advertisement was not relevant because it depicted a promotional white product which was only on the market for a limited time before the Response was filed. (*Id.* at ¶ 34).

Defendants chide WMH for not disclosing WI's advertisements for infringing Shop Fox products beginning in about 2004. This is an attempt to benefit by their own infringement, since an infringing use is not a basis for denial of registration. *See e.g., L.D. Kichler Co. v. Davoil, Inc.,* 192 F.3d 1349, 1352 (Fed. Cir. 1999). As such, any alleged omission of this information is not material and thus cannot be a basis for asserting fraud on the PTO. *See Gaffrig Performance Industries, Inc. v. Livorsi Marine, Inc.,* 2003 U.S. Dist. LEXIS 23018, at *40 (N.D. Ill 2003). Furthermore, Mr. Box testified that he had only seen one Shop Fox product (with a black base) on the market at the time of his declaration and thus did not consider them a relevant competitor at that time. (WMH Fact ¶ 34).

In its accompanying statement of facts pursuant to LR 56.1, WMH sets forth at greater length facts showing why Defendants are simply wrong in characterizing their laundry list of alleged "uses" of white as having relevance, because they do not constitute uses of white on "the same or similar goods," in the "relevant industry," and by "competitors." WMH so believed in good faith, and there is no evidence of a willful intent to deceive.

### C.    Defendants Fail To Adequately Plead Or Prove An Intent To Deceive The PTO Regarding The Date Of First Use

WMH's application cited a date of first use of May 15, 1996. (*Id.* at ¶ 19). Since WMH did in fact begin marketing white metalworking products by that time, and since a trademark applicant need only specify a single date of first use for a single good in each class, 37 C.F.R. § 2.34(a)(1)(iii); TMEP § 903.09, this date is accurate. Furthermore, both the Box declaration and its exhibits plainly detailed the timeline of dates of use (*see* p. vii, *supra*), further undermining Defendants' argument that WMH was hiding or misrepresenting information regarding first use before the PTO. (WMH Fact ¶ 35). Defendants have no evidence to controvert these facts, nor have they proven any other facts indicating even a hint of an intent to deceive based upon the date of first use.[8]

---

[8] As an entirely separate basis for granting summary judgment regarding the date of first use, it is well-settled law that as long as the first use preceded the application date, an incorrect date of first use is not a material representation that may serve as a ground for cancellation. *Miyano,* 576 F. Supp. 2d at 879-80; *see also Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.,* 522 F.3d 1200, 1210 (11th Cir. 2008); *Pony Express Courier Corp.*

As Judge Mason held in this case "**None of the documents show any evidence of fraud.**" (*Id.* at ¶¶ 56-57) (emphasis added). If Defendants were unable to present even a *prima facie* case of fraud to Judge Mason with their best foot forward, following an *in camera* review of privileged documents (*see id.*), then they are certainly unable to meet the clear and convincing standard now upon them. As a result, summary judgment should be granted in favor of WMH.

## II.   *NOERR-PENNINGTON* IMMUNITY APPLIES TO WMH'S ACTIONS AND DEFENDANTS' COUNTERCLAIMS SEEKING DAMAGES MUST BE DISMISSED

All of Defendants' alleged damages are specifically claimed to arise from CBP's enforcement activities and not from WMH's trademark registration itself. WMH's actions were privileged, and it is immune from liability for damages arising from CBP's performance of its statutory duties.

### A.   *Noerr-Pennington* Immunity

WMH did not exercise self-help remedies as a lawless vigilante. It is well-established that a party is not liable for petitioning the government to influence the passage or enforcement of laws to eliminate competition. *Pennington*, 381 U.S. at 670; *Noerr*, 365 U.S. at 135; *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). This is known as "*Noerr-Pennington*" immunity. Disposing of claims privileged under *Noerr-Pennington* via summary judgment is common practice.[9]

In *California Motor Transport Co. v. Trucking Unlimited*, the Supreme Court extended the protections of *Noerr-Pennington* immunity to petitions made to the Executive Branch and its administrative agencies, as well as the courts. 404 U.S. 508, 510 (1972). *Noerr-Pennington* precludes liability arising from petitions for allegedly improper administrative seizure of infringing goods. *Cf. Clorox Co. v. Inland Empire Wholesale Grocers, Inc.*, 874 F. Supp. 1065, 1069 (C.D. Cal. 1994) (*Noerr-Pennington* immunized the trademark holder from a Clayton Act claim arising from the seizure of bottles, despite claim that affidavits submitted in support contained misrepresentations).

---

*of Am. v. Pony Express Delivery Serv.*, 872 F.2d 317, 319 (9th Cir. 1989); *isp.net, LLC v. Qwest Comm'n's Int'l, Inc.*, 2003 U.S. Dist. LEXIS 9076, at *9 (S.D. Ind. 2003); *Aveda*, 706 F. Supp. at 1426; *Isaly Co. v. Kraft, Inc.*, 619 F. Supp. 983, 996 (M.D. Fla. 1985). An incorrect date would simply not result in a refusal to register. The uncontroverted evidence establishes that actual use of the JET White mark occurred prior to the application filing date.

[9] *See e.g., Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* (PRE), 508 U.S. 49, 57 (1993) (affirming grant of summary judgment based on *Noerr-Pennington* immunity); *Cheminor Drugs Ltd. v. Ethyl Corp.*, 168 F.3d 119, 120 (3d Cir. 1999) (same); *Hufsmith v. Weaver*, 817 F.2d 455, 460 (8th Cir. 1987) (same); *Assigned Container Ship Claims, Inc. v. Am. President Lines, Ltd.*, 784 F.2d 1420, 1421 (9th Cir. 1986) (same); *Zemenco, Inc. v. Developers Diversified Realty Corp.*, 2005 U.S. Dist. LEXIS 23011, at *35-37 (W.D. Pa. 2005) (granting summary judgment based on *Noerr-Pennington* immunity); *Barq's Inc. v. Barq's Beverages, Inc.*, 677 F. Supp. 449, 452 (E.D. La. 1987) (same).

There is also immunity from liability arising out of the filing and maintaining a civil lawsuit. *PRE*, 508 U.S. at 57. This includes a trademark owner's efforts to protect its rights. *See e.g., Frayne v. Chi. 2016*, 2009 U.S. Dist. LEXIS 1267, at *9 (N.D. Ill. 2009) (actions to protect a trademark are protected under the doctrine); *AmeriMax Real Estate Partners v. Re/Max Int'l Inc.*, 83 U.S.P.Q. 2d 1752, 1757 (N.D. Ill. 2006); *Thermos Co. v. Igloo Prods. Corp.*, 1995 U.S. Dist. LEXIS 18382, at *15 (N.D. Ill. 1995). Additionally, courts regularly extend the immunity to shield non-judicial acts that are "reasonably and normally attendant upon protected litigation." *Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997).

The *Noerr-Pennington* doctrine has been extended to protect against business tort claims, including tortious interference with prospective economic advantage and unfair competition, among others. *See e.g., Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 140 (3d Cir. 2005) (claims of tortious interference with prospective economic advantage); *Cheminor*, 168 F.3d at 128-29 (state law tort claims for tortious interference and unfair competition); *Hufsmith*, 817 F.2d at 458-60 (same); *see also Frayne*, 2009 U.S. Dist. LEXIS 1267, at *9.

## B.    Limited Exceptions To *Noerr-Pennington* Immunity

In rare instances, a party may be deprived of its *Noerr-Pennington* immunity. Activity attempting to influence the government is not protected if it is a "mere sham" to cover an attempt to interfere directly with the business relationships of a competitor. *PRE*, 508 U.S. at 51. Mere evidence of anticompetitive intent alone is not enough. *Id.* at 59. Rather, there is a two-part test to determine whether the exception applies. *Id.* at 60-61. Under the first prong, the sham litigation "must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief." *Id.* at 49. If probable cause exists, *Noerr-Pennington* immunity applies regardless of the defendant's subjective motivations. *Id.* at 63.

This Court affirmed that WMH's claims are not baseless, and accordingly that the "sham" exception cannot apply here, by denying Defendants' summary judgment motion. (Doc. No. 314). Since this is the law of the case, *see* note 5, *supra*, WMH's subjective motivations are irrelevant.

Some lower courts[10] have treated misrepresentations as justifying a separate exception. *See e.g., Mercatus Group LLC v. Lake Forest Hosp.*, 528 F. Supp. 2d 797, 804 (N.D. Ill. 2007). These courts find that a party may be deprived of immunity if it made a material misrepresentation in an adjudicatory setting—this is sometimes referred to as the "sham" exception as "adapted to the adjudicatory

---

[10] The Supreme Court has not explicitly ruled that the so-called "misrepresentation exception" exists. It expressly declined to discuss how misrepresentations or fraud play into the "sham" exception in *PRE*, 508 U.S. at 61 n.6; *Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.*, 185 F.3d 154, 160 (3d Cir. 1999).

process." *Metro Cable v. CATV of Rockford, Inc.*, 516 F.2d 220, 226-28 (7th Cir. 1975) (quoting *California Motor*, 404 U.S. at 513). Where an alleged misrepresentation was to an administrative agency, it must first be determined whether that agency may be classified as "adjudicatory." *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998); *Metro Cable*, 516 F.2d at 228; *Mercatus*, 528 F. Supp. 2d at 804-805. Administrative agencies are treated like judicial entities only to the extent that their actions are guided by enforceable standards subject to review. *Kottle*, 146 F.3d at 1062.

If the agency is not adjudicatory, the exceptions to *Noerr-Pennington* are extraordinarily narrow. Indeed, the right of access to administrative proceedings has such strong First-Amendment underpinnings that conduct far more egregious than anything WI/GI have alleged here is protected. Even "outright lies" are protected in typically contested administrative settings. *See Kottle*, 146 F.3d at 1061; *Metro Cable*, 516 F.2d at 228.

**C.      *Noerr-Pennington* Immunizes WMH As A Matter Of Law From Liability For Damages Resulting From CBP's Enforcement Activities**

WMH's CBP petition and related activities are immunized under *Noerr-Pennington* as a matter of law because petitions to the executive branch and its administrative agencies are privileged. *California Motor*, 404 U.S. at 510. CBP is an administrative agency within DHS. Thus, WMH's recordation of its trademark and petition to CBP are *prima facie* protected activities under *Noerr-Pennington. Id.*

Moreover, the doctrine also provides immunity from liability arising out of the WMH filing and maintaining this civil lawsuit. *PRE*, 508 U.S. at 57. The *Noerr-Pennington* privilege shields a trademark owner's efforts to protect its rights. *See e.g., AmeriMax*, 83 U.S.P.Q. 2d at 1757; *Thermos*, 1995 U.S. Dist. LEXIS 18382, at *15. Since these activities all clearly fall within the ambit of legitimate efforts to protect its rights, they are protected under *Noerr-Pennington*.

**D.      No Exception Applies To Deprive WMH Of Its *Noerr-Pennington* Immunity**

WMH had reasonable expectations of success when it petitioned CBP to detain Defendants' equipment. Any alleged anti-competitive intent does not transform a legitimate petition into a sham so long as the party had an objectively reasonable basis to petition. *PRE*, 508 U.S. at 57.

Here, there is no question that WMH could reasonably expect success on the merits of a petition to CBP to cease Defendants' infringement. Petitioning the government to protect trademark rights is authorized by statute and regulations and is an objectively reasonable approach to preventing infringement. *See Clorox*, 874 F. Supp. at 1069. The JET White mark is federally registered, giving it a presumption of validity. 15 U.S.C. § 1115(a); *V&V*, 683 F. Supp. at 666 (registered marks owed a "strong" validity presumption). The industry recognizes this registered mark as indicative of WMH's JET products. (WMH Fact ¶ 14). WMH has also successfully enforced

its mark against several other infringers. (*Id.* at ¶ 13). These facts certainly made it objectively reasonable for WMH to conclude that a favorable outcome would likely result from its petition. This conclusion is further supported by the fact that CBP did not detain Defendants' infringing goods until completing its own *independent* infringement determination. (*Id.* at ¶¶ 40, 43, 48-49, 53). Accordingly, WMH's petition was not objectively baseless.

The so-called "misrepresentation exception" does not apply at least because CBP was not acting in an adjudicatory role. *Metro Cable*, 516 F.2d at 228; *Mercatus*, 528 F. Supp. 2d at 804-5. The administrative procedures followed by CBP are entirely different from other administrative agencies found to be acting in an adjudicatory fashion. *See e.g.*, *Kottle*, 146 F.3d at 1062 (holding public hearings, allowing affected persons to question witnesses, following rules of evidence, and having decisions appealable under APA procedures are indicative of an adjudicatory proceeding); *cf. Metro Cable*, 516 F.2d at 228; *Mercatus*, 528 F. Supp. 2d at 806.

Even more fundamentally, Defendants cannot show any issue of fact that any alleged misrepresentations were knowingly made. Defendants vaguely allege that WMH misrepresented owning a valid mark to CBP. That, as a matter of law, is not a misrepresentation. Once registered, a trademark is presumed valid. 15 U.S.C. §1115(a); *V&V*, 683 F. Supp. at 666. In all events, while CBP may consider evidence presented by any party, it makes its own determinations regarding infringement allegations before detaining or seizing goods. (*Id.* at ¶ 40). Here, Defendants brought the alleged true facts to CBP's attention, but CBP apparently rejected Defendants' arguments as meritless (as they were by Judge Mason in this case). Thus, CBP did not rely upon any alleged misrepresentations in reaching their determination, and they cannot, as a matter of law, be material. *Kottle*, 146 F.3d at 1063. Accordingly, WMH has *Noerr-Pennington* immunity and summary judgment on Defendants' claims for damages must be granted.

## CONCLUSION

Plaintiff's motions for partial summary judgment should be granted.