IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WMH TOOL GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 07 C 3885 |
| WOODSTOCK INTERNATIONAL, INC., and GRIZZLY INDUSTRIAL, INC., | ) | |
| | ) | The Honorable John W. Darrah |
| Defendants. | ) | |
| WOODSTOCK INTERNATIONAL, INC., and GRIZZLY INDUSTRIAL, INC., | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| | ) | [PUBLIC (REDACTED) VERSION] |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WMH TOOL GROUP, INC., | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## WMH'S RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS

Plaintiff, WMH Tool Group, Inc. ("WMH"), hereby respectfully submits this Local Rule 56.1 statement of material facts in support of its motions for partial summary judgment.

### The Parties

1.      Plaintiff WMH Tool Group, Inc. ("WMH or Plaintiff") is a corporation organized under the laws of the State of Washington with its corporate headquarters located at 2420 Vantage Drive, Elgin, Illinois 60124. (Doc. No. 1, Compl. ¶ 1; Doc. No. 89, Answer to Am. Countercls. ¶ 2.)

2.      Defendants, Woodstock International, Inc. ("Woodstock") and Grizzly Industrial, Inc. ("Grizzly") (collectively "Defendants"), are both Washington corporations whose principal place of business is 1821 Valencia Street, Bellingham, Washington 98229, and are under common ownership and control. (Doc. No. 86, Answer to Compl. ¶ 4.). Defendants are national suppliers of woodworking and metalworking machinery and tools. Defendants conduct business in Illinois and

in this District, and have customers in Illinois and in this District. (Doc. No. 86, Answer ¶¶ 2-3, Am. Countercls. ¶ 2.)

## Jurisdiction and Venue

3.      This Court has jurisdiction over the subject matter of this action under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and 1338(b), 1367, and 2201. (Doc. No. 1 ¶ 6; Doc. No. 86, Answer to Compl. ¶ 6, Am. Countercls. ¶ 4.)

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391. (Doc. No. 1, Compl. ¶ 8.)

5.      Defendants admitted that this Court has jurisdiction. (Doc. No. 86 ¶ 6.)

6.      Defendants admitted that venue is proper in this District. (Doc. No. 86 ¶ 8.)

## General

7.      Both Defendants in this lawsuit, Woodstock and Grizzly, sell woodworking and metalworking machinery competitive with WMH's JET brand. (Doc. No. 86, Answer to Compl. ¶¶ 2, 3, Am. Countercls. ¶ 2.) Defendants and WMH compete in a niche market which consists of woodworking and metalworking enthusiasts, hobbyists, and small-shop professionals. (Doc. No. 86, ¶¶ 22, 32; Doc. No. 372 (Witter Decl.) ¶ 3; Doc. No. 369 (Chenier Decl.) ¶¶ 3, 4; Doc. No. 368 (Carter Decl.) ¶ 3; Doc. No. 370 (Hewitt Decl.) ¶ 3; Doc. No. 371 (Wirth Decl.) ¶¶ 3-5; *see also* Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 5, 85:7-16; Ex. 6, 9:3-25, 45:24-46:3; Ex. 32, 13:7-14, 21:22-22:1, 25:16-22.) *see also* Doc. No. 363 (LaRocco Decl.) ¶ 2 at Ex. 10, 13:7-14, 21:22-22:1, 25:16-22; Ex. 11, 85:7-16; Ex. 12, 9:3-25, 45:24-46:3.)

8.      Defendant Woodstock, under the "Shop Fox" brand name, imports, advertises, and sells admittedly white woodworking and metalworking machines that are confusingly similar to WMH's registered trademark. (Doc. No. 372 (Witter Decl.) ¶ 14; Doc. No. 369 (Chenier Decl.) ¶ 15; Doc. No. 368 (Carter Decl.) ¶ 15; Doc. No. 370 (Hewitt Decl.) ¶ 9; Doc. No. 371 (Wirth Decl. ) ¶ 12.) Defendant Grizzly, under the Grizzly or Grizzly Industrial brand name (as well as the Shop Fox brand name), also imports, advertises, and sells white woodworking and metalworking machines that are allegedly tan but which are nevertheless confusingly similar to WMH's registered trademark due to the white appearance of the machines in print and internet marketing.

9.     Defendants are wholly owned by, and are alter egos of, Shiraz Balolia, who has additional business interests in the U.S., China, and Taiwan. (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 1, pp. 3-4; 34-35.) Mr. Balolia, through his various companies, including both Defendants Grizzly and Woodstock, seeks to benefit from the good will of others by intentionally copying their products. Industry participants and industry experts regard Mr. Balolia as an imitator rather than an innovator. Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 2, 45:1-2, 76:1-8; Doc. No. 372 (Witter Decl.) ¶¶ 9-10, 14; Doc. No. 369 (Chenier Decl.) ¶¶ 13-15; Doc. No. 368 (Carter Decl.) ¶¶ 11-15; Doc. No. 370 (Hewitt Decl.) ¶¶ 7-9; Doc. No. 371 (Wirth Decl.) ¶¶ 11-13.)

10.     WMH is aware of at least eight legal proceedings and many other disputes settled short of litigation, including at least ███████████████████████████ ████████████████████ (Doc. No. 351.) Not one civil action has resulted in judgment in Defendants' favor. (*Id.*) In fact, many of the companies that have become involved in disputes with Mr. Balolia and his companies about this intentional copying believe he drove up the costs of the disputes purposefully. (Doc. No. 370 (Hewitt Decl.) ¶ 6; Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 3, p. 2.)

11.     WMH has sold woodworking and metalworking machines since 1958. (Doc. No. 367 (Varzino Decl.) ¶ 3). In the mid-1990s, WMH undertook to upgrade the actual and perceived quality of its products. To publicize that corporate goal, and to establish a new uniform image in the marketplace, JET debuted its line of metalworking machines in a new "JET White" color beginning in 1996. (*Id* at ¶ 4.) In 1998, JET launched its woodworking machines in the same white color. (*Id*) (*See also* Doc. No. 380 (Little Decl.) ¶ 2 Ex. 29 (JET advertisement detailing timeline)). This uniform white color clearly differentiated JET's product line from the substantial sea of gray, green, blue, and black colors its competitors were predominantly using at that time. (Doc. No. (Varzino Decl.) ¶ 5.)

12.     Since 1998, JET has invested over 40 million dollars in advertising its JET white trademark through advertisements in trade publications, cooperative advertising with its dealers, catalogs, and trade shows. (*Id* at ¶ 8.) Through this extensive marketing, the white color of JET's machinery has come to be recognized as "JET White." Aggregate sales of JET's white machinery total close to 800 million dollars. (*Id* at ¶¶ 9-10.)

13.     During this time, WMH has also diligently protected its trademark. (*Id.* at ¶ 11.) WMH has enforced its rights in the color white against Menards, Wilke, House of Tools, Pro-Tech, and Tannewitz. (*Id.*). Each instance of enforcement resulted in the termination of the infringer's use of a color white similar to JET White, an agreement to switch to a new, dissimilar color, and often an acknowledgement of the JET White trademark. (*Id.*)

14.     Industry customers, dealers, and experts recognize the JET White mark as indicating WMH as the source of the machinery. Many of these industry players compete with WMH in the woodworking and metalworking industry. (*See, e.g.*, Doc. No. 368 (Carter Decl.) ¶ 6; Doc. No. 369 (Chenier Decl.) ¶7; Doc. No. 392 (Damon Decl.) ¶8; Doc. No. 393 (Henderson Decl.) ¶¶7-8; Doc. No. 370 (Hewitt Decl.) ¶ 5; Doc. No. 395 (Kaplanek Decl.) ¶ 5; Doc. No. 396 (Lambert Decl.) ¶ 8; Doc. No. 397 (Lombard Decl.) ¶ 8; Doc. No. 398 (Mann Decl.) ¶ 5; Doc. No. 399 (Nagyszalanczy Decl.) ¶¶ 15-16; Doc. No. 400 (Nyquist Decl.) ¶ 8; Doc. No. 401 (Robinson Decl.) ¶ 7; Doc. 404 (Takemoto Decl.) ¶ 8; Doc. No. 405 (Wethey Decl.) ¶ 7; *see also* Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 2 at 30:20-31:20; Ex. 5, 18:10-19:3; Ex. 6 at 13:16-14:16, 41:7-17; Ex. 7 at 9:16-10:3, 11:9-17; Ex. 8 at 16:13-18, 43:3-14; Ex. 9 at 11:12-16; Ex. 10 at 15:6-11.)

### Prosecution of the JET White Trademark

15.     WMH submitted its use-based application for the color white as applied to the exterior surfaces of certain woodworking and metalworking machinery on March 6, 2003. (Doc. No. 363 (LaRocco Decl.) ¶ 2 at Ex. 4.8, pp. 300635.000158-174.)

16.     WMH's outside counsel filed and prepared the application on behalf of WMH. (*Id.* at Ex. 5, 32:2-5.) Mr. Clair was the attorney responsible for overseeing prosecution of the '180 mark. (*Id.* at 34:20–35:1; Ex. 6, 11:16–12:4; *see also Id.* at ¶ 2 at Ex. 4.8, p. 300635.000161.)

17.     The application was signed by Robert Romano, WMH's in-house counsel. (*Id.* at Ex. 4.8, p. 300635.000165; Ex. 5, 8:15-21, 32:6-8.) Mr. Romano also signed a declaration in connection with the application declaring that he believed that WMH was entitled to use of the mark in commerce, that to the best of his knowledge and belief, no other person, firm, corporation or association had the right to use the mark in commerce, and that he believed all statements made in the application were true to the best of his knowledge. (*Id.* at Ex. 4.8, p. 300635.000165; Ex. 5, 32:9-14, 33:4-10.) Mr. Romano made this statement based upon his own review of the application, his

knowledge of the industry at that time, as well as his reliance that the people within WMH who provided the information within the application "would have been in the best position to know that information and to provide it" accurately. (*Id.* at Ex. 5, 36:5–37:1.)

18.      Furthermore, Mr. Romano testified that prior to signing the application and declaration, he would have read the entire application, and he would have spoken to Mr. Clair, as well as others within WMH, until he was satisfied about the contents of the application. (*Id.* at 43:18-9.) Mr. Romano is "very careful" about what he signs and would not have signed such documents without being satisfied about their accuracy.[1] (*Id.* at 44:3-4.)

19.      The application included, among other things, a date of first use of May 15, 1996, and the identification of goods recited:

> Consumer and industrial woodworking and metalworking equipment, namely power saws, bandsaws, chop saws, tablesaws, cabinet saws, arbors, planers, jointers, molders, jigs, shapers, mortisers, welders, grinders, routers, drills, drill presses, tapping presses, milling machines, feeders, lathes, shears, rotary machines, sanders, polishers, buffers, platform trucks, pallet trucks, dust collectors, air filtration systems, and coolant systems, and parts, fittings and accessories for all the aforesaid goods, namely tool tables, cabinets, stands, bases and covers.

(*Id.* at Ex. 4.8, p. 300635.000160.) This list of goods was drafted by Mr. Clair based upon attorney-client privileged communications with WMH. (*Id.* at Ex. 6, 28:2-29:13, 88:20-89:3.)

20.      Mr. Box testified that he recalled approving the listing of goods. (*Id.* at Ex. 7, 40:9-10.) Mr. Box also testified at length as to the specific types of products listed as well as his knowledge as to whether WMH was selling such products at that time. (*See generally id.* at pp. 9-34.)

21.      Mr. Clair similarly testified at his deposition multiple times that "before submitting this use-based application, I consulted and confirmed with the client use of the color white on the products identified." (*Id.* at Ex. 6, 86:2-6; *see also id.* at 32:24-33:1, 33:23-24, 89:22-90:6, 105:4-7.) Mr. Clair also testified that all of the goods listed under Class 7 were in use because "[t]hey wouldn't be

---

[1] Preparation and prosecution of this application took place over six years ago. As such, Mr. Box, Mr. Romano and Mr. Clair all had to rely upon their review of non-privileged documents in an effort to refresh their recollection as to the events. Moreover, many of the employees who were or may have been involved are no longer with the company and were not available for questioning in this case.

listed in [sic] the use based application if they weren't all in use." (*Id* at 32:13-14.)

22.     Mr. Romano similarly testified that he would have verified the accuracy of the listing of goods and that the information in that list was provided by people who were familiar with the products. (Doc. No. 363 (LaRocco Decl.) ¶ 2 at Ex. 5, 50:2-10.)

23.     The PTO issued an Office Action on August 23, 2003. (*Id* at ¶ 2 Exs. 4.7 and 4.8, pp. 300635.000144-155.) The Office Action refused registration on the basis that the mark was merely ornamental or functional and because the proposed mark was used on goods in both International Class 07 and Class 08. (*Id* at Ex. 4.7, pp. 300635.000144-46.)

24.     The Office Action requested additional information on whether the color white serves any functional purpose on the goods - whether it was a by-product of the manufacturing process. (*Id* at Ex. 4.7, p. 300635.000145) The Office Action also requested that the applicant address the use of color "in the relevant industry" and that "[t]he applicant must delete International Class 08 from the application." (*Id* at Ex. 4.7, p. 300635.000146.)

25.     The Examiner requested information on any other use of color by WMH on the same goods, and whether "competitors" produce the "same or similar goods" in the color white, or other colors. (*Id*) The Examiner also requested color photographs and advertisements showing "competitive goods," as well as WMH's own advertisements and promotional literature relating to the color white mark. (*Id*) Specifically, the Examiner proposed the following language for the description of the mark: "The mark consists of the color WHITE as applied to the exterior surfaces of the goods at the square base, legs, and arbor excluding the top surface, wheel and instrumentation . . . ." (*Id* at Ex. 4.7, p. 300635.000148.) The Examiner further noted that certain informalities must be addressed, including amending the identification of goods to more clearly address the nature of goods on which the mark is used, as well as the description of the mark. (*Id* at Ex. 4.7, pp. 300635.000147-148.)

26.     Upon receiving the Office Action, Mr. Clair spoke with WMH personnel about responding to the Office Action. (*Id* at Ex. 6, 92:5-14.) Mr. Box confirmed that he knew WMH was asked for information in responding to the Office Action. (*Id* at Ex. 7, 47:22-23.) Mr. Clair also testified, and Mr. Romano confirmed, that Mr. Clair asked for information and/or documents regarding the use of color by competitors in the relevant industry. (*Id* at Ex. 6, 92:18-24; Ex. 5,

28:20-22, 29:5.) Similarly, because the Office Action requested information about whether competitors produce the same or similar goods in the color white or in other colors, Mr. Clair asked WMH for information or documents regarding the same. (*Id.* at Ex. 6, 94:12-24.)

27.     Upon receiving Mr. Clair's request, WMH investigated and gathered the pertinent information and documents. (*Id.* at Ex. 5, 31:11-19.) Mr. Romano testified that "typically, when requests are made, as I have come to learn in office actions, there may be various people within the company who know or have some information regarding the matters that are requested. Those people will be asked to provide the information" often directly to the requester. (*Id.* at 53:18–54:5.) Thus, WMH, through its routine practice of consulting with various employees, provided the requested and necessary documents to Mr. Clair, which in turn were ultimately attached to the Office Action response. (*Id.* at Ex. 6, 93:7-22.) Mr. Clair testified that he does not believe that he received any additional documents other than what was attached to the response. (*Id.* at Ex. 6, 93:23-94:1.)

28.     Mr. Clair also testified that before filing a response to the Office Action, he participated in a telephone conference with the Examiner responsible for WMH's application. (*Id.* at Ex. 6, 108:7-9.) During this phone conversation, Mr. Clair and the Examiner discussed possible amendments to the description of the mark. (*Id.* at Ex. 6, 108:14-18.) The Examiner initially proposed a description limiting the white mark to appearance on "... the square base thereof... " (*Id.* at Ex. 6, 107:10-11.) However, upon WMH noting that not all the bases were "square," the Examiner agreed to a somewhat broader rectangular base description. (*Id.* at Ex. 6, 107:11-14.) This was the only issue discussed during the phone conference. (*Id.* at Ex. 6, 109:1-7.)

29.     WMH's response to the August 23 Office Action was timely filed on March 1, 2004. (*Id.* at Ex. 4.1-4.7, pp. 300635.000005-143.) As requested by the Examiner, the application was limited to goods in Class 7 and the description of the mark was amended to be directed to the color white at "the rectangular base thereof" as agreed upon during the telephone conference. (*Id.* at Ex. 4.1, 300635.000007-8; Ex. 6, 127:1-5.) Also as requested by the Examiner, WMH's response amended the identification of goods and the following identification was submitted in place of the original:

> Woodworking and metalworking machines, namely, power saws, bandsaws, chop saws, tablesaws, cabinet saws, planers, jointers,

> molders, jigs, shapers, mortisers, grinders, routers, drills, drill presses,
> milling machines, lathes, shears, sanders, and structural parts thereof,
> sold as a complete unit in International Class 7.

(*Id* at Ex. 4.1, p. 300635.000007.) Further, several goods that did not have a rectangular base were deleted from the identification to comply with the amendment, thus narrowing the scope of the application. (*Compare* ¶ 19, *supra*; *see also* Doc. No. 363 (LaRocco Decl.) ¶ 2 at Ex. 6, 107:15-24.)

30.     The response also addressed in detail the Examiner's concerns regarding functionality and ornamentality, and submitted supporting exhibits and the Declaration of Scott Box. (*Id* at Ex. 4.1, pp. 300635.000007-20.) WMH's response noted that the two printouts from the "fireballfab" website were unnamed devices such that it was not clear what function the machine performed. (*Id* at Ex. 4.1, p. 300635.000009) WMH also pointed out that the printout from the "dbm" website contained all foreign machines, and that they were CNC (complete numeric control) equipment which is an entirely different market. (*Id*) As such, the printouts did not show the color white was functional nor were they otherwise relevant. (*Id*)

31.     To establish that color may be source-indicative and non-functional, Exhibit A to WMH's response provided the Examiner with examples of competitive manufacturers providing woodworking and metalworking machines in industry-standard colors. (*Id* at Ex. 4.1, p. 300635.000010). This Exhibit included advertisements of manufacturers such as Defendant Grizzly and General International, both of which feature green bases. (*Id* at Ex. 4.1, pp. 300635.000010, 22-26.)

32.     Exhibit B to the response shows that color may be a source identifier on woodworking and metalworking machines. (*Id* at Exs. 4.1-4.2, pp. 300635.000010, 27-87.) Combined with Registration No 2,143,835 shown in the table in the Response (and in Exhibit C), this evidence showed that the color white is capable of being a trademark both generally and in the power tool industry. (*Id*)

33.     While the response included identification of competitors such as General, with its green products (*see* ¶ 30, *supra*), it did not include any documents showing evidence of use of the color white on all woodworking and metalworking machines because the Examiner had expressly and properly limited his request for the use of white by "competitors" and, based upon the

information known to WMH, there were not any "competitors" using the color white in their market in a relevant way at that time. (Doc. No. 363 (LaRocco Decl.) ¶ 2 at Ex. 6, 95:16-23.)

34.     Mr. Box was aware of some incidental uses of white, but he was of the opinion that they were (a) not competitors (largely due to price differences and WMH's fairly narrow market niche), and/or (b) temporary uses, for example promotional items in the market for a limited time, and/or (c) were only a small part of a large product line primarily consisting of non-white products. (Id at ¶ 2 at Ex. 10, 33:3-17, 105:8-14; Ex. 7, 62:20-63:10, 98:11-100:8.) For instance, while Mr. Box recalled seeing Shop Fox products advertised, he had only encountered one model in the actual marketplace (which had a black base), and thus he did not consider Shop Fox a relevant competitor of WMH's JET line at that time. (Id at 98:4-99:16.) Mr. Carter similarly testified that he saw advertisements of Shop Fox products knocking off his company's molders, but that he was unable to purchase one for months afterwards. (Id at Ex. 11, 20:17-21:5.) Mr. Box also stated that the while Delta advertisement was not relevant because it depicted a promotional product which was only on the market for a limited time before the response was filed. (Id At Ex. 7, 63:1-10.)

35.     WMH's response also contained evidence that the color white as used by WMH had acquired distinctiveness through its substantially exclusive use. (Id at Ex. 4.1, pp. 300635.000010-11, 17-19, 88-143). (See also id at Ex. 9, ¶¶ 31-38.) This evidence included the Scott Box declaration and its supporting exhibits. (Id at Ex. 4.3-4.7, pp. 300635.000094-143.) Notably, Exhibit 4 to the Scott Box declaration showed WMH advertisements featuring the JET White color. (Id at Ex. 4.6, p. 300635.000128-132.) The advertisement specifically states that in 1999, "JET is completing the last phase in a four-year plan to convert all JET equipment and tools to rich JET white." The advertisement goes on to lay out the time line, noting that in 1995-1997, market research was started leading to the introduction of "JET's rich white machines." (Id at p. 300635.000131.) Phase II occurred in 1998 when the color conversion introduced anniversary white woodworking machines. (Id) Phase III occurred in 1999 when JET's entire woodworking line was converted to white. (Id)

36.     The Examiner found WMH's arguments and evidence persuasive, and on June 30, 2004, the PTO issued a Notice of Publication under 12(a) for the purpose of opposition. (Id at Ex. 4.1, p. 300635.000004.) The statutory time period passed without opposition, and on October 12, 2004, Registration Number 2,893,180 issued to WMH for "the color white as applied to the exterior surfaces of the goods at the rectangular base thereof excluding the top surface, while, and

instrumentation." . (*Id.* at Ex. 4.1, p. 300635.000003.)

## Subsequent Customs Enforcement

37.        The United States Customs and Border Patrol ("CBP") is the division of the Department of Homeland Security ("DHS") charged with "the dual mission to prevent terrorists and terrorist weapons from entering the United States while facilitating the flow of legitimate trade and travel." (Doc. No. 57-3 at 1.) As part of its authority, CBP maintains authority under 19 U.S.C. § 1526 to "protect American trademark owners from unfair competition from foreign-sourced infringing articles." (Doc. No. 57-3 at 1-2; *see also* Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 11, ¶¶ 2.2-2.3.)

38.        CBP protects a trademark owner's rights using a two-tiered enforcement option. (*Id.* at Ex. 11, ¶ 2.1.) Under the first tier, the "recordation process," a trademark holder may record its trademark with CBP. (*Id.*) Under the second tier, the "application process," the owner of a registered trademark who has also recorded that mark with CBP may provide CBP with information about the importation of violative imports so that CBP may take any necessary action. (*Id.* at ¶ 2.3.) Although CBP policy mandates that most of its resources be placed upon the enforcement of recorded trademarks, unrecorded marks may also be enforced. (*Id.* at ¶ 4.1.)

39.        The procedure for recordation is outlined by Federal Regulation. (19 C.F.R. §§ 133.1 *et seq.*) Recordation of a trademark entitles the trademark owner to protection from unauthorized imports under a variety of statutory and regulatory provisions. (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 11, ¶ 2.) Trademark owners who have recorded their trademarks may request that CBP collect and retain information pertaining to their trademark rights for a specified time. (*Id.* ¶ 2 at Ex. 11, ¶ 2.2.) During this time, CBP shall either on its own, or with the assistance of the trademark holder, actively monitor imports to prevent the importation of violative goods. (*Id.*)

40.        CBP does not automatically bar importation upon receiving notice of potential infringing imports. (*Id.* at Ex. 13, p. 300445.000071-72.) Before any action is taken, CBP must first ascertain whether the trademark in question is recorded and the extent of protection to which the trademark is entitled. (*Id.* at Ex. 11, ¶ 4.1.2.) CBP then conducts its own infringement determination to assess whether any of the alleged goods are in fact infringing the defined rights of the trademark holder. (*Id.* at ¶ 4.0, 4.1.3; Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 14; Ex. 28 p. 30.)

41.     Defendants' own counsel recognizes the important benefits that are realized by enlisting CBP to protect one's trademark. Defendants' law firm notes that an important step in maintaining your trademark rights is to record it with CBP and to sometimes "work[] shoulder-to-shoulder with CBP to successfully detect and stop counterfeits at the border." (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 30, pp. 3-4.)

42.     WMH recorded the '180 mark with CBP on July 27, 2005. (*Id* at Ex. 13, p. 300445.000072.) On or around May 16, 2007 (two months before the tradeshow in question), WMH petitioned CBP, requesting that CBP bar importation of certain metalworking and woodworking equipment manufactured and imported by Defendants that WMH believed infringed upon its trademark. (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 15; Ex. 16, 66:20-24.) The petition requested that "CBP take all additional appropriate remedial steps, including, but not limited to, the seizure and forfeiture of, the imposition of civil penalties with respect to, and/or the exclusion from entry of the products in question." (*Id* at Ex. 15 p. 300445.000004). WMH requested that CBP take this action solely in an effort to protect and enforce its rights in the JET White trademark. (*Id* at Ex. 16, 72:21-73:10.)

43.     CBP did not automatically grant WMH's petition, and instead requested more information. (*Id* at Ex. 13, p. 300445.000071-72.) In June of 2007, WMH responded with legal and factual arguments in support of its petition, including arguments supporting the validity of color-based trademarks and the scope of WMH's trademark protection. (*Id* at p. 300445.000071-81.)

44.     Thereafter, WMH filed the instant case on July 10, 2007. (Doc. No. 1.) On the same day, WMH demanded in writing that Mr. Balolia cease using WMH's mark, and invited a negotiated settlement with WMH. (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 17; Ex. 16 at 76:4-10.) Defendants refused. (*Id* at Ex. 18; Ex. 16, 76:4-10.)

45.     Defendants responded to WMH's infringement charges in this Court with a variety of defenses and ten of its own counterclaims. (Doc. No. 86.) Count VIII alleges tortious interference with prospective economic advantage, and Count IX alleges civil liability for false or fraudulent registration under 15 U.S.C. § 1120. (*Id*) Defendants claim that WMH's "actions resulted in the U.S. Customs seizure and detention of [Defendants'] products at the AWFS trade show in Last Vegas, July 18-21, 2007." (*Id* at ¶ 47.) Defendants also took immediate action to attempt to

cancel WMH's trademark by instituting proceedings before the PTO. (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 19.)

46.     Defendants' Affirmative Defenses 1-3 and 8 and Counterclaims I-III, IX-XI are based upon allegations of fraud on the PTO. (Doc. No. 86) Specifically, Defendants contend that WMH committed fraud by (1) falsely representing to the PTO that the mark was used on all goods listed in the identification of goods when it was not; (2) alleging a date of first use in 1996 on woodworking goods when it was not used on these goods until 1998; and (3) alleging substantially exclusive and continuous use when WMH allegedly knew that its use was not exclusive. (*See id.*)

47.     WMH contacted the management of the Association of Woodworkers and Furnishings Suppliers ("AWFS") to try to resolve the matter amicably before the commencement of the show scheduled to take place July 18 to July 21, 2007. (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 20.) AWFS indicated their appreciation for the "heads up" and subsequently sent letters to both Defendants notifying them of WMH's claims and their hopes to resolve this matter before the show started. (*Id.* at Ex. 31.)

48.     Exercising its statutory privilege, WMH also notified CBP of Defendants' intent to display their infringing machines at AWFS. (*Id.* at Ex. 16, 72:21-73:16.) At one point, CBP proposed seizing Defendants' machines at the border to prevent the use of any infringing machines at AWFS. (*Id.* at 74:15-19.) ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████ (*Id.* at Ex. 21.)

49.     On July 19, 2007, Thomas Kalmes, an agent at CBP, approached representatives of Defendants. (Doc. No. 402 (Romano Decl.) ¶ 3; *see also* Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 22, p. 22105.) In private (the AWFS show manager's office), CBP informed Defendants that CBP deemed some of their white machines infringing and others to be counterfeit. (Doc. No. 402 (Romano Decl.) ¶ 4; *see also* Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 22, p. 22106.) Following agency policy, CBP declined to disclose its basis for reaching this conclusion to both Defendants and WMH. (Doc. No. 380 (Little Decl.) *Id.* at ¶ 2 at Ex. 22, pp. 22105-06.) CBP requested that Defendants voluntarily remove models of their equipment off the show floor, but told them it could wait until after hours. (Doc. No. 402 (Romano Decl.) ¶ 5.) When their attempts to persuade CBP otherwise failed, rather

than wait until the show closed and thus avoid a scene, decided to immediately remove the 8 Shop Fox products and 1 Grizzly product from the show floor. (*Id.* at ¶ 6.)

50.     Defendants acquired a temporary restraining order from a court in this district to release the equipment later that same day. (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 22, p. 22107.) CBP released the equipment upon receiving notice of the temporary restraining order. (*Id.* at Ex. 23, pp. 3709-12; Ex. 22, p. 22107.) As a result, Defendants' equipment was only off the trade show floor for a few hours during the afternoon of July 19th. (*Id.*)

51.     WMH did not seek to disrupt the AWFS show or in any way cause damage to Defendants' reputation, but rather merely sought the enforcement of its registered trademark through legitimate means, including recordation and petition of CBP in accordance with CBP's statutory charge and its administrative directive. (Doc. No. 380 (Little Decl.) ¶ 2 at Ex. 20, pp. 746-748; Ex. 24.) This was confirmed by WMH's former president Peter Chatel, as well as current president Robert Romano. (*Id.* at Ex. 16, 72:21-73:5, 73:11-16, 75:12-16; Ex. 25, 52:8-24.)

52.     After the AWFS show, WMH continued to pursue its petition of CBP to enforce its registered and recorded trademark. (*Id.* at Ex. 16, 76:21-77:1, 77:20-78:1.) These efforts were resumed only after a careful review of the remedies available to WMH and of the temporary restraining order issued in relation to the AWFS show. (*Id.* at 78:20-79:16.)

53.     In response to the petition, on July 27, 2007, Defendants' counsel submitted a lengthy written petition presenting detailed arguments as to why CBP should not consider its goods to infringe WMH's mark, and requesting that CBP decline to enforce WMH's mark. (Doc. No. 403 (Steuart Decl.) ¶ 3; Doc. No. 308 (Little Decl.) ¶ 2 at Ex. 26.) The CBP stated that it would consider these arguments carefully in making its decision. (Doc. No. 403 (Steuart Decl.) ¶ 3.)

### Ensuing Legal Proceedings

54.     On October 29, 2007, Defendants moved for a Preliminary Injunction regarding machines being detained by Customs officials. (Doc. No. 45.) WMH responded on November 5 (Doc. No. 70), and this Court heard arguments on January 17, 2008. (Doc. No. 105). On February 14, 2008, this Court issued its decision. (Doc. No. 109.) As noted in the Court's order, "[a]t this stage of the proceedings, Defendants need only demonstrate that they have a 'better than negligible'

chance of succeeding on the merits." (*Id* at 5.) With this very low burden in mind, the Court granted Defendants' motion and ordered WMH to consent to the release of Defendants' detained machinery. (*Id* at 10.) Thereafter, the parties conducted extensive discovery, with fact discovery closing on February 26, 2009 (doc. no. 254) and expert discovery closing on June 30, 2009 (Doc. No. 344).

55.    After the close of all discovery, Magistrate Judge Mason ruled upon a still-pending discovery request brought by Defendants to compel the deposition of WMH's counsel, Mr. Clair. (Doc. No. 359.) In that request, Defendants alleged that the deposition was necessary as Mr. Clair had "unique knowledge of disputed facts related to the '180 Reg." (*Id* at 4.) Defendants further alleged that WMH could not assert attorney-client privilege as to certain documents in part because the crime-fraud exception applied. (*Id* at 10.) Defendants relied upon this Court's preliminary injunction ruling as support for their argument, and of course had the entire record compiled during the massive discovery Defendants had conducted. (*Id* at 14.)

56.    Judge Mason found that *in camera* review of the privileged documents from Mr. Clair was warranted "[a]fter considering the District Court's conclusions, as well as the transcript of Mr. Blanchfield's testimony and other evidence defendants submitted in connection with their opposition to plaintiff's motion for protective order [189] . . . ." (*Id* at 15.) When reviewing the documents, Judge Mason noted that:

> we looked for evidence of any inaccurate statements or efforts to conceal facts related to: (1) the description and identification of goods; (2) the date of first use of the goods listed in the '180 Reg; or (3) prior knowledge of third-party use(s) of the color white in connection with woodworking and metalworking machines. We also looked for any suggestion or request that WMH withhold information from the PTO.

*(Id at 16.)*

57.    After review, Judge Mason concluded that "[n]one of the documents show any evidence of fraud" and that "there is simply no basis for this court to find that any of the communications were 'intended to facilitate or conceal the alleged crime or fraud.'" (*Id*) Judge Mason additionally noted that the parties dispute the applicable standard for fraud, but stated that the court's ruling was the same under either standard. (*Id* at 12 n.2.) Thus, the court held that "Defendants have not produced any independent evidence of an intent to deceive the PTO, or

shown that WMH made material representations of fact that it knew or should have known to be false."

58.     The report of William G. Kennedy, Defendants' damages expert, alleges that as a

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████. (Little Decl. ¶ 2 at Ex. 27, 19:9-15.)   No other alleged actions of WMH are stated as the basis for Defendants' alleged damages.  (*See generally* Doc. No. 86.)

In accordance with Local Rule 56.1, WMH submits this statement of material facts that require granting WMH's motions for partial summary judgment.

Dated: September 9, 2009                    Respectfully submitted,

                                            /s/ Steven C. Schroer
                                            Steven C. Schroer
                                            Edward E. Clair
                                            Christine A. Pompa
                                            Shane Delsman
                                            Fitch, Even, Tabin & Flannery
                                            120 South LaSalle Street
                                            Suite 1600
                                            Chicago, Illinois 60603-3406
                                            Telephone:     (312) 577-7000

                                            *Attorneys for Plaintiff, WMH Tool Group, Inc.*