UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WMH TOOL GROUP, INC.,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | Case No. 07-cv-3885 |
| v.      ) | |
| ) | Judge John W. Darrah |
| WOODSTOCK INTERNATIONAL,      ) | |
| INC. and GRIZZLY INDUSTRIAL,      ) | |
| INC.,      ) | |
| ) | |
| Defendants.      ) | |

## **MEMORANDUM OPINION AND ORDER**

WMH Tool Group, Inc. ("WMH") owns a registered trademark for the color white as applied to exterior surfaces of certain of WMH's woodworking and metalworking machinery. The mark is registered as number 2,893,180 (hereinafter, the "'180 registration" or "'180 mark"). WMH filed this lawsuit against Grizzly Industrial, Inc. ("Grizzly") and Woodstock International, Inc. ("Woodstock") (collectively, "Defendants"), alleging nine causes of action, all involving Defendants' alleged use of the color white in connection with Defendants' woodworking and metalworking machines. WMH brought its claims under the Lanham Act (Counts I-IV), the U.S. Tariff Act (Count V), Illinois common law (Count VI), and Illinois statutes (Counts VII-IX).

Defendants deny WHM's claims and assert various affirmative defenses and counterclaims, seeking declaratory judgments that WMH's '180 mark is invalid and alleging that WMH is responsible for harm Defendants suffered as a result of the seizure of Defendants' machines at a trade show.

Currently before the Court are the parties' cross motions for summary judgment. Defendants move for summary judgment as to each of WMH's claims, claiming WMH never acquired the requisite secondary meaning in the color white as applied to WMH's goods, and for a declaratory judgment that the '180 mark is invalid (Counterclaim V).[1] Defendants also move for summary judgment on Counterclaims III, X, and XI, each of which seeks a declaratory judgment that WMH's '180 mark is invalid based on WMH's alleged fraudulent misrepresentation to the United States Patent and Trademark Office ("PTO").

WMH moves for summary judgment on Defendants' First, Second, Third, and Eighth Affirmative Defenses and Counterclaims I through III and IX through XI, all of which allege fraud on the PTO. WMH also moves for summary judgment on Defendants' damages counterclaims (VIII and IX), claiming immunity under the *Noerr-Pennington* doctrine. As explained below, Defendants' motion is denied in its entirety; and WMH's motion is granted in part and denied in part.

## BACKGROUND

Before delving into the facts of this case, the Court notes that both sides – WMH in particular – have made the resolution of the issues raised by the parties' motions an unnecessarily difficult task. Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(b)(3) requires the non-moving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material

---

[1] The Court previously granted summary judgment on Count III (dilution) as to Grizzly on April 8, 2009. (Dkt. Nos. 313, 314.)

facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). For purposes of the instant motions, the Court will not consider any "irrelevant information, legal arguments, and conjecture" from either party.[2] *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006). Nor will the Court undertake the inefficient task of painstakingly combing through the parties' voluminous submissions, searching for factual support for and against the various nonresponsive, conclusory assertions. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[J]ust as a district court is not required to scour the record looking for factual disputes, it is not required to scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case.") (citation and internal quotation marks omitted). After sorting through the parties' voluminous filings containing *inter*

---

[2] A few examples: Both parties submitted "supplemental" or "additional" statements of facts appended to their Local Rule 56.1(b)(3) responses. This is not permitted by the Local Rules, and with good reason; it does not afford the opposing party any opportunity to rebut those statements. *See Premier Capital Mgmt., LLC v. Cohen*, No. 02 C 5368, 2008 WL 4378313, at *2 n.4 (N.D. Ill. Mar. 24, 2008).

The declaration prepared by WMH's survey expert *after* Defendants filed their summary judgment brief and long after expert discovery closed on June 30, 2009, will not be considered. Summary judgment affidavits may not contain expert testimony not previously disclosed. *Cent. States, Se. & Sw. Areas Pension Fund v. Transp. Serv. Co.*, No. 00 C 6181, 2009 WL 424145, at *5 (N.D. Ill. Feb. 17, 2009) (citing *Mannoia v. Farrow*, 476 F.3d 453, 456 (7th Cir. 2007)).

Arguments are scattered throughout statements of fact and responses, particularly by WMH, who alleges that "WMH's JET brand had acquired distinctiveness" (WMH 56.1(b) ¶ 17) and that Defendants used marks "confusingly similar to WMH's registered trademark" (WMH 56.1(a) ¶ 8). These are legal conclusions, which WMH could not possibly have expected to be admitted as undisputed facts. WMH also repeatedly interjects improper argument into its responses. (*See, e.g.*, WMH Resp. to Def. 56.1(b) ¶ 3 ("This partial denial does not prevent the Court from granting WMH's motion because . . . .").) Statements of material facts submitted pursuant to Local Rule 56.1 are no place for argument. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

*alia* improper portions of the parties' Local Rule 56.1 submissions, the Court is left with the following undisputed facts.

WHM sells woodworking and metalworking machines under its "JET" brand of products. Grizzly and Woodstock, both founded by Shiraz Balolia, import, advertise, and sell woodworking and metalworking machinery. (WMH 56.1(b) ¶¶ 6, 9.) Grizzly has been selling woodworking and metalworking machinery since 1983. (Def. 56.1(a) ¶ 6.) Woodstock has been selling woodworking accessories since 1989 and has been selling woodworking machinery under its "Shop Fox" brand since 2001. (Def. 56.1(a) ¶ 6.) The Shop Fox brand also includes metalworking machinery. (WMH 56.1(b) ¶ 11.) Portions of both Defendants' product lines overlap and directly compete with WMH's JET machines. (WMH 56.1(b) ¶ 10.)

Beginning around 1996, WMH started using a white color for certain JET metalworking machines; and WMH expanded its white color scheme to woodworking machines in or around 1998. (WMH 56.1(b) ¶¶ 1-2.) JET's 1996/1997 catalog included a four-page advertisement touting JET's "White Hot" "complete package of manual metalworking machinery," and its 1998/1999 catalog advertised certain woodworking and metalworking machines as "wrapped in JET's rich white finish." (WMH 56.1(b) ¶¶ 1-2.)

According to WMH, JET products are directed toward the entry level of the woodworking and metalworking industries. (WMH 56.1(b) ¶¶ 5-6.) The most expensive JET woodworking and metalworking machines cost approximately $4,000 and $34,000, respectively. (WMH 56.1(b) ¶¶ 5, 6.) WMH directs its JET metalworking machines to

small shops and maintenance-repair shops, not to the high-production market, which is dominated by automated machinery costing millions of dollars. (WMH 56.1(b) ¶ 6.)

On March 26, 2003, WMH filed a trademark application to register "the color white" as applied to the exterior surface of certain consumer and industrial woodworking and metalworking equipment listed in WMH's application. (WMH 56.1(b) ¶ 3; Def. 56.1(a) ¶ 45.) Robert S. Romano, Vice President and General Counsel of WMH, signed the application for the '180 Registration on behalf of WHM. (Def. 56.1(a) ¶ 58.) Edward Clair, counsel for WMH, filed it. (Def. 56.1(a) ¶ 58.) Romano signed a declaration in connection with the application, stating his belief that WMH was entitled to use the white mark in commerce and that all statements made in the application were true based upon his own review of the application, his knowledge of the industry at that time, and his reliance on people within WMH. (WMH 56.1(a) ¶ 17.) The original application cited May 15, 1996, as the date of first use and recited a list of goods in International Classes 7 (machinery) and 8 (hand tools). (WMH 56.1(a) ¶ 19.) Clair drafted the list of goods based on information provided by someone at WMH. (Def. 56.1(a) ¶ 59; WMH 56.1(a) ¶ 19.) Scott Box, of WMH, approved the list. (WMH 56.1(a) ¶ 20.)

On August 28, 2003, the PTO mailed an Office Action to Mr. Clair, stating that the proposed mark was refused as "merely an ornamental feature of the goods." (Def. 56.1(a) ¶ 63.) The Examiner requested additional information:

> The applicant's response must also address the use of color in the relevant industry. The applicant must advise the examining attorney of any other use of color by the applicant, such as if the applicant sells the same goods in other colors. The applicant must also indicate whether competitors

produce the same or similar goods in the identified color and in colors other than the identified color. The applicant must provide color photographs and color advertisements showing competitive goods.

(Def. 56.1(a) ¶ 63.)

After receiving the Office Action, Clair spoke with WMH personnel and asked for information and/or documents regarding the use of color by competitors in the relevant industry and about whether competitors produce the same or similar goods in the color white or in other colors. (WMH 56.1(a) ¶ 26.) Clair filed a timely response on March 1, 2004, to which he attached all documents that he obtained from WMH. (WMH 56.1(a) ¶¶ 27, 29.) Among those documents were WHM advertisements featuring the JET white color, one of which specifically states that in 1999, "JET is completing the last phase in a four-year plan to convert all JET equipment and tools to rich JET white." (WMH 56.1(a) ¶ 35.)

Clair also attached examples of competitive manufacturers' woodworking and metalworking machines in a variety of colors. (WMH 56.1(a) ¶¶ 31-32.) One submitted publication contained the cover and three pages from the October 2003 issue of *Popular Woodworking*, showing green machinery by various manufacturers (including Grizzly) as examples of "industry standard colors." (Def. 56.1(b) ¶ 10.) Box testified that it was a habit of his to look through entire issues of trade publications and that he "could almost assure" that he had looked at the entire October 2003 issue of *Popular Woodworking*. (Def. 56.1(a) ¶ 67.) But other pages from the same issue, depicting white-colored goods made by WMH's competitors, were omitted (Defendants claim deliberately so). (Def. 56.1(b) ¶ 11.) Although Box was aware of some white woodworking and metalworking

products in the market, he did not provide examples of those products to Clair based on Box's belief that the other products were (a) not competing goods; (b) limited offerings; and/or (c) a small part of a large product line primarily consisting of non-white products. (WMH 56.1(a) ¶ 34.) Clair submitted Box's declaration, stating that the color white had become distinctive of WMH's goods "by reason of substantially exclusive and continuous use . . . for more than five years preceding the date" of the declaration. (Def. 56.1(b) ¶ 12.)

Pursuant to the instructions in the Office Action, and to a subsequent teleconference between Clair and the examiner, WMH's response limited the identification of goods to Class 7 (machinery), amended the mark to the color white as applied to "the rectangular base" of WMH's goods and removed several goods from the list that did not have rectangular bases. (WMH 56.1(a) ¶ 29.) Box swore that he did not withhold any material information from the PTO and that he "truly believed" – and still believes today – that what was in the application is accurate and correct. (WMH 56.1(b) ¶ 34.)

On June 30, 2004, the PTO issued a Notice of Publication in connection with the application; and on October 12, 2004, the PTO registered WHM's '180 mark for "the color white as applied to the exterior surfaces of the goods at the rectangular base thereof excluding the top surface, wheel and instrumentation." (Def. 56.1(a) ¶¶ 71-72; WMH 56.1(b) ¶ 4.)

WHM has invested and continues to invest millions of dollars in advertising its JET white trademark through advertisements in trade publications, cooperative

7

advertising with dealers, and trade shows. (WMH 56.1(b) ¶ 7.) Sales of JET's white machinery total close to $800 million. (WMH 56.1(b) ¶ 7.) WMH has enforced its perceived rights in the color white against numerous alleged infringers, resulting in the termination of each alleged infringer's use of a color similar to JET white, an agreement to switch to a new dissimilar color, and in most cases, an acknowledgement of WMH's right to the JET white mark. (WMH 56.1(b) ¶ 8.) Robert Varzino, WMH VP of marketing, tries to ensure that the color white stands for JET by making each JET product a consistent white color, through depictions of JET products in advertisements, and by grouping JET white products together at tradeshows. (WMH 56.1(b) ¶ 40.)

Woodstock did not begin manufacturing and selling white-looking woodworking machinery until 2001. (Def. 56.1(a) ¶ 9.) Grizzly sold white goods at least as early as 2000/2001. (WMH Resp. to Def. 56.1(a) ¶ 8.)

Defendants' products aside, white-looking woodworking and metalworking machines have continuously been on the market for at least the last twenty years. (Def. 56.1(b) ¶ 4; see also Def. 56.1(a) ¶¶ 13, 25-26, 28 (citing examples of white machinery produced by other manufacturers).) Scott Box, himself, even promoted a white-colored table saw as "White Hot" in a 1997 trade magazine and a 1999 tool-buying guide during his pre-WMH tenure at Delta Machinery Corporation. (Def. 56.1(a) ¶¶ 34-36.) Other persons in the woodworking and metalworking industries testified that manufacturers other than WHM have produced white-colored woodworking and metalworking products since before 1995 and that they do not believe the color white to be unique to any one supplier. (Def. 56.1(a) ¶¶ 39-41.)

On July 27, 2005, WMH recorded its '180 mark with the United States Customs and Border Protection division of the Department of Homeland Security ("Customs"). (WMH 56.1(a) ¶¶ 37, 42.) On or around May 16, 2007, WMH petitioned Customs, requesting that Customs bar importation of certain metalworking and woodworking equipment manufactured and imported by Defendants, which WMH believed to be infringing its JET white trademark, and "take all additional appropriate remedial steps, including, but not limited to, the seizure and forfeiture of, the imposition of civil penalties with respect to, and/or the exclusion from entry of the products in question." (WMH 56.1(a) ¶ 42.) Upon Customs' request, WMH provided legal and factual arguments to support its petition. (WMH 56.1(a) ¶ 43.)

On July 10, 2007, WHM filed the instant suit and sent a cease-and-desist letter to Balolia, inviting a negotiated settlement with WMH. (WMH 56.1(a) ¶ 44.) Also in July, WMH contacted the management of the Association of Woodworkers and Furnishings Suppliers ("AWFS") to alert AWFS about WMH's claims against Defendants. (WMH 56.1(a) ¶ 47.) WMH then notified Customs of Defendants' intent to display allegedly infringing machines at an upcoming AWFS tradeshow. (WMH 56.1(a) ¶ 48.) On July 19, 2007, a Customs agent arrived at the AWFS tradeshow and informed Defendants that certain of Defendants' machines were deemed counterfeit and that all products at issue would have to be removed. (WMH 56.1(a) ¶ 49.) Eight Woodstock Shop Fox products and one Grizzly product were removed from the show floor. (WMH 56.1(a) ¶ 49.) That same day, Defendants obtained a temporary restraining order from this Court enjoining

the seizure, and the machines were returned to the show floor the following morning. (WMH 56.1(a) ¶ 50.)

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763,

773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

To prove infringement of a trademark that is not inherently distinctive, a plaintiff must establish that its mark acquired secondary meaning before the alleged infringer first began using the allegedly infringing mark. *See Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) ("A plaintiff must establish secondary meaning in a mark at the time and place that the defendant began using the mark."); *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1201 (Fed. Cir. 1994) ("Secondary meaning must be shown to have existed prior to the date on which the accused infringer commenced using a confusingly similar trade dress."). Defendants claim that "WMH did not and could not have acquired rights in the color white for woodworking and metalworking machines" and, therefore, cannot prevail as a matter of law on any of WMH's counts. (Def. Mot. for Summ. J. at 2.)

Color alone can acquire secondary meaning as a source identifier for goods and can be registered as a federal trademark. *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162 (1995). "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its products or services in that particular industry that the [mark] has come to mean that those products or services are the company's trademark." *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 728 (7th Cir. 1998). Registration of a mark on the Principal Register of the PTO constitutes *prima facie* evidence that the mark is valid. 15 U.S.C. § 1115(a); *see also Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). That

presumption is easily rebuttable, however, because it merely shifts the burden of production to the alleged infringer. *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 486 (7th Cir. 2007).

## ANALYSIS

### Secondary Meaning – Defendants' Motion for Summary Judgment on Counts I through IX and Counterclaim V

Defendants first argue that their own production of white-looking machinery precludes any secondary meaning in WMH's use of the color white such that all of WMH's claims must fail as a matter of law. Grizzly argues that it first began using a white-looking color on certain machinery in 1983 and that it has continuously used it on a particular dust-collection machine since 1986. (Def. 56.1(a) ¶ 8.) WMH did not begin making white machinery until 1996. (Def. 56.1(a) ¶ 7.) Based on these dates, Grizzly argues that it cannot be liable for infringement. Although WMH does not deny the existence of white-looking band saws in Grizzly's 1983, 1984, and 1985 catalogs, WMH observes that there is no evidence that Grizzly manufactured those goods at any point after 1985. (WMH Resp. to Def. 56.1(a) ¶ 8.) WMH further observes that Grizzly's dust-collection machine is actually painted green, with the only white appearing on the machine's cloth bags and duct work. (*Id.*) (WMH is not contending that Grizzly's dust-collection machine infringes WMH's '180 mark.) Therefore, the Court finds that Grizzly has not presented sufficient evidence on summary judgment for the Court to hold that Grizzly's use of white on its own goods prevented WMH from acquiring secondary meaning as a matter of law.

Regarding Woodstock, Defendants merely make conclusory allegations that Woodstock began using a white-looking color on its machinery "well before WMH could have even claimed that it had acquired distinctiveness." (Def. Mot. for Summ. J. Br. at 8.) But Woodstock did not begin manufacturing and selling its white-looking Shop Fox machinery until 2001 – five years after WMH. (Def. 56.1(a) ¶¶ 7, 9.) The critical question on this issue is not when WMH registered its mark but whether WMH had acquired a secondary meaning in its mark before the time and place that Defendants first began using the same mark. 2 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:34 (4th ed. 2009) (citing, *inter alia, Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 221 F. Supp. 576, 583-84 (E.D. Wis. 1963) *aff'd* 330 F.2d 667 (7th Cir. 1964)). WMH claims that its mark did acquire secondary meaning before Defendants began using the mark on their goods.

Defendants then claim that an overwhelming number of third-party manufacturers have used and continue to use a white-looking color on their woodworking and metalworking machinery and that such use rebuts WMH's claimed secondary meaning. WMH responds by arguing that Defendants are placing undue emphasis on only one of multiple factors to be considered in determining the existence of secondary meaning and that the goods identified by Defendants are either not relevant or are entitled to little weight from the fact finder.

The Seventh Circuit has identified several factors relevant to determining whether a mark has acquired secondary meaning: (a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of

advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying. *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989).

Defendants focus on the exclusivity-of-use factor, citing many examples of allegedly competitive goods produced with WMH's mark before WMH could have acquired secondary meaning. In an effort to overcome the significance of these other uses, WMH argues for a narrow construction of the relevant market and claims that all uses cited by Defendants were not relevant based on one or more of the following reasons: they were not competing with WMH's goods; they did not display the same mark as WMH; they were abandoned before WMH's mark acquired secondary meaning; they were not produced until after WMH's mark acquired secondary meaning; or any use of the mark was *de minimis*. (*See* WMH Resp. to Def. Mot. for Summ. J. at 7-12.) Because Defendants moved for summary judgment on this issue, the Court must construe all reasonable inferences in WMH's favor, and the Court does so, understanding that motions for summary judgment in trademark infringement cases "must be approached with great caution." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993). Defendants have not demonstrated, for purposes of summary judgment, that WMH's white trademark did not gain secondary meaning prior to Defendants' use of that mark in 2001. The issue is highly fact intensive, requiring consideration of multiple factors.

Accordingly, Defendants' Motion for Summary Judgment as to WMH's Counts I through IX and Defendants' Counterclaim V (invalidity for lack of acquired distinctiveness) is denied.

*Fraud – Defendants' Motion for Summary Judgment*
*on Counterclaims III, X, and XI*

Defendants also seek summary judgment on Counterclaims III, X, and XI, each of which alleges fraud on the PTO. In order to establish a claim for fraud on the PTO, Defendants must establish the following elements as to all of these counts: (1) that the registrant made a false factual representation to the PTO; (2) that the misrepresentation was material to the validity of the registration; and (3) that the misrepresentation was made with fraudulent intent. *Zip Dee, Inc. v. Domestic Corp.*, 900 F. Supp. 1004, 1009 (N.D. Ill. 1995). A statement is material if "the Examiner would still have allowed the registration if the misrepresentation was removed from the decision-making mix." *Id.* at 1010. Fraudulent intent requires knowingly making a false, material misrepresentation with the intent to deceive the PTO. *In re Bose Corp.*, 580 F.3d 1240, 1244-45 (Fed. Cir. 2009) (*Bose*).[3]

---

[3] Throughout this litigation, Defendants have relied on *Medinol Ltd. v. Neuro Vasx, Inc.*, 67 U.S.P.Q.2d 1205 (T.T.A.B. 2003) (*Medinol*), a decision from the Trademark Trial and Appeal Board identifying the fraud standard as one of negligence – i.e., that the applicant "knew or should have known" that a material statement was false. After Defendants filed their Motion for Summary Judgment, however, the Federal Circuit explicitly discredited the standard set forth in *Medinol*. *See Bose*, 580 F.3d at 1244-45. The standard is now clear: fraud requires subjective intent to deceive the PTO. *Id.* at 1245. It is not enough merely to prove that false statements were made or that facts were withheld. *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 877 (8th Cir. 1994).

In their Motion for Summary Judgment, Defendants specifically allege that WMH made three fraudulent misrepresentations to the PTO in procuring the '180 mark: (1) WMH's inclusion of routers and chop saws on its list of goods; (2) WMH's failure to inform the PTO of competitors' use of the color white; and (3) WMH's statement that it had successfully enforced its rights in the mark against more than one entity.

As an initial matter, Defendants' third fraud allegation would not dispose of any claim in this suit. Defendants did not plead this allegation as a counterclaim or affirmative defense in response to WMH's Complaint; and even now, they offer very little support for this theory, other than to argue that WMH's production of only one enforcement agreement proves WMH's statement that it had enforced the mark against entities (plural) was fraudulent. Defendants have not shown this representation to be material, and they appear to have abandoned this theory in their reply brief. At any rate, because these allegations are not contained in any of Defendants' affirmative defenses or counterclaims, this argument does not present any claim or defense for the Court to grant or deny on summary judgment.

Turning to Defendants' remaining fraud allegations, Defendants' first argument concerns WMH's allegedly false representation to the PTO that WMH was using its mark on routers and chop saws. WMH maintains that the statement was true and that Defendants have not shown that WMH intended to deceive the PTO.

As evidence of falsity, Defendants point to the testimony of George Blanchfeld and Scott Box. Blanchfeld is a current WMH employee; it is unclear whether he was employed by WMH at the time the application for the '180 mark was prepared and filed.

(*See* WMH Resp. to Def. 56.1(b) ¶ 5.) Box is no longer employed by WMH but did work for WMH during 2003-2004 when the application was procured.

The dispute regarding chop saws seems to hinge on what exactly qualifies as a "chop saw." According to Defendants, both Blanchfeld and Box testified that WMH did not manufacture chop saws. But Blanchfeld clearly stated that one of JET's horizontal band saws could be construed as a chop saw. (WMH Resp. to Def. 56.1(a) ¶ 60.) And Box's testimony is ambiguous. As a 30(b)(6) representative of WMH, Box stated that JET did not sell chop saws in 2004. (Def. 56.1(a) ¶ 61.) But he later testified that JET's band saws could be referred to as chop saws. (WMH Resp. to Def. 56.1(a) ¶ 61.)

The parties also dispute what is necessary to classify a machine as a "router." At the preliminary injunction hearing in January 2007, Blanchfeld testified that WMH was not selling routers at that time. (Def. 56.1(a) ¶ 60.) But that hardly answers the question of whether WMH falsely listed routers on the '180 application *in 2004*. Box's testimony is again ambiguous; he testified that WMH was not selling routers in 2004 (Def. 56.1(a) ¶ 61) but later claimed that WMH made a shaper that could be converted to a router and that it was fair to classify that machine as a router. (WMH Resp. to Def. 56.1(a) ¶ 61.) WMH also relies on an expert report prepared for this litigation, classifying some of WMH's pre-application machinery as chop saws and routers. (WMH 56.1(b) ¶ 36.)

WMH's arguments involve issues of credibility, and credibility is a determination to be made at the time of trial. Construing all inferences in WMH's favor, the Court cannot conclude for purposes of summary judgment that WMH's inclusion of chop saws and routers on the application for the '180 mark was a misrepresentation.

Defendants also argue that WMH committed fraud by deliberately withholding information about competitors' white machines in response to the PTO's Office Action. Defendants allege that WMH was aware of such uses and that WMH fraudulently withheld relevant documents from the PTO and even omitted pages from a particular reference that was provided. Defendants also highlight the fact that Box himself had launched a "GREAT WHITE" and "WHITE HOT" advertising campaign for machines produced by another company, which employed Box before Box was at WMH.

WMH's response is to argue that WMH had no duty to "ferret out and disclose" any adverse information, that the term "competitor" is subjective, and that WMH had a "reasonable belief that the companies and uses of 'white-like' color alleged by Defendants, are **not** competitive and, therefore, irrelevant to the query posed by the Examiner." (WMH Resp. to Def. Mot. for Summ. J. at 14 (emphasis in original).) WMH also claims that a reasonable jury could find WMH's nondisclosure was immaterial – that is, that the '180 registration would have issued regardless of these alleged omissions.

Defendants have offered evidence suggesting that WMH knowingly failed to produce relevant information responsive to the Examiner's request for examples of competitors' use of "the same or similar goods in the identified color." And contrary to WMH's assertions, WMH did have a duty to provide any known examples to the Examiner instead of unilaterally deciding they were not relevant. *See Gaffrig Performance Indus. v. Livorsi Marine, Inc.*, Nos. 99 C 7778, 99 C 7822, 2003 WL 23144859, at *14 (N.D. Ill. Dec. 22, 2003) ("Although it is true that in the initial application there is no duty to so investigate and report, . . . in this case the PTO

explicitly requested this information. . . . [The applicant] was obligated to truthfully answer whether there was other significant use of the mark – regardless of whether [the applicant] believed them to be junior users . . . .").

WMH answers Defendants' argument by claiming WMH's machines were the only white ones in the relevant market. This again presents substantive questions of fact as to whether WMH did make material misrepresentations to the PTO. Accordingly, Defendants' Motion for Summary Judgment as to Counterclaims III, X, and XI is denied.

*Fraud – WMH's Motion for Summary Judgment*
*on Counterclaims I, II, III, IX, X, and XI and on*
*Defendants' First, Second, Third, and Eighth Affirmative Defenses*

Turning now to WMH's motion, even if WMH's inclusion of chop saws and routers on the '180 application or WMH's omission of information about competitors' products constitutes a material misrepresentation, there can be no fraud without intent to deceive the PTO. WMH argues that Defendants cannot prove any such intent and that summary judgment must therefore be entered in WMH's favor on each of Defendants' fraud counterclaims and affirmative defenses.

WMH begins by arguing that Defendants have failed to plead and prove the necessary "who, what, when, where, and how" of their fraud allegations required by Federal Rule of Civil Procedure 9(b). *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009). Among other things, WMH argues that Defendants have not specified "who" at WMH acted with a deliberate intent to deceive the PTO, "how" any of WMH's actions demonstrate a deliberate intent to deceive, "what" specific information was misrepresented to the PTO, and "when WMH made any alleged decision

to withhold or misrepresent information to the PTO. However, the time for challenging the sufficiency of the pleadings has long passed.[4]

The inquiry here requires a determination as to whether a disputed material factual issue remains after considering the materials submitted regarding summary judgment. Defendants claim WMH misrepresented that WMH was using its mark on routers and chop saws and that WMH misrepresented that it was not aware of any competitors' using white on similar goods in WMH's application and its response to the Office Action regarding the '180 mark, which were submitted to the PTO on March 3, 2003, and March 1, 2004, respectively. Defendants contend that misrepresentations were made in the declarations submitted to the PTO, and Robert Romano and Scott Box are the only two individuals who submitted declarations. Romano signed the original application, which included chop saws and routers on the list of goods, as well as an accompanying declaration attesting to the truth of all matters asserted in that application. (*See* WMH 56.1(a) ¶¶ 15, 17.) Box executed a declaration in response to the Office Action in which he stated his belief that the mark had "become distinctive as applied to [WMH's] goods by reason of substantially exclusive and continuous use thereof by [WMH] in commerce" and that "[u]pon information and belief, [WMH's] mark acquired distinctiveness as a source identifier for [WMH] on

---

[4] *See* 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 9.03[5] (2009) ("If the failure to plead with particularity under Rule 9(b) is not raised in the first responsive pleading or in an early motion, the issue will be deemed waived."); *Bonilla v. Trebol Motors Co.*, 150 F.3d 77, 81 (1st Cir. 1998) (treating opposition to motion for summary judgment as a *de facto* amendment to the allegations in a pleading in order to avoid the "silly" task of allowing amendment to restate the allegation for which the moving party had notice).

woodworking and metalworking machines prior to any third-party use of the color white on woodworking and metalworking machines." (*See* Def. 56.1(b) ¶ 12.) If false, these sworn statements by Romano and Box clearly form the basis of Defendants' allegations.

Thus, the question at this stage is not whether Defendants pleaded fraud but whether they can prove it. Although deceptive intent can be inferred from circumstantial evidence, that intent must be shown by clear and convincing evidence. *Bose*, 580 F.3d at 1245. Here, Defendants have identified a genuine dispute as to whether WMH was producing white chop saws and routers at the time WMH submitted its application to the PTO and, consequently, whether Romano's application was fraudulent. As discussed above, a reasonable fact finder could very well discredit WMH's claim that the machines it had produced by 2003 were actually chop saws and routers and could also conclude that misrepresenting such a simple matter to the PTO shows an intent to deceive the PTO into expanding the class of goods on which the mark was used. The finder of fact could also consider the evidence of other white machinery in the market, discredit Box's narrow construction of the term "competitor" and deem Box's omission to constitute an attempt to defraud the PTO into believing WMH's use of the color white on its goods was substantially exclusive, when in fact it was not.[5]

---

[5] Throughout its briefs, WMH claims an order by Magistrate Judge Mason has already resolved the issue of fraud in WMH's favor. But Judge Mason's opinion merely resolved the issue of whether the crime-fraud exception to the attorney-client privilege prevented WMH from withholding certain documents claimed to be privileged in a discovery dispute. That finding is not tantamount to holding that Defendants' claims of fraud must fail as a matter of law. This Court did not vest authority in Judge Mason to rule on dispositive issues in this case.

Ultimately, Defendants have demonstrated a genuine issue of material fact as to whether any intent to deceive the PTO can be inferred from the evidence in this case. WMH's Motion for Summary Judgment on Counterclaims I, III, IX, X, and XI and on Defendants' First, Third, and Eighth Affirmative Defenses is therefore denied.

WMH's Motion for Summary Judgment on Defendants' Second Affirmative Defense and Counterclaim II, however, is granted. Both allege that WMH fraudulently represented to the PTO that the '180 mark was first used on woodworking machines in 1996, despite not being used until 1998. WMH maintains that the date is accurate because a trademark applicant need only specify a single date of first use for a single good in each class. *See* 37 C.F.R. § 2.34(a)(1)(v) (2009) ("If more than one item of goods or services is specified in the application, the dates of use required . . . need be for only one of the items specified in each class . . . ."). Defendants have not identified any evidence to support this particular theory of fraud and have not responded to WMH's arguments, nor do Defendants address this affirmative defense and counterclaim in their own motion. Accordingly, WMH's Motion for Summary Judgment on Defendants' Second Affirmative Defense and Counterclaim II is granted.

### *Noerr-Pennington Immunity – WMH's Motion for Summary Judgment on Counterclaims VIII and IX*

WMH also moves for summary judgment on all of Defendants' claims for damages, asserting immunity from liability under the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine is rooted in the First Amendment and allows a party to petition the government for official action favorable to its interests without fear of suit,

even if the results of that action might harm the interests of competitors. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137-44 (1961); *Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999). The *Noerr-Pennington* doctrine has been extended to petitions made to the Executive Branch and its administrative agencies, *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (*Cal. Motor*), and can preclude liability arising from petitions for allegedly improper administrative seizures of infringing goods, *cf. Clorox Co. v. Inland Empire Wholesale Grocers, Inc.*, 874 F. Supp. 1065, 1069 (C.D. Cal. 1994) (holding trademark holder immunized from Clayton Act claim arising from seizure of goods, despite claim that affidavits submitted in support contained misrepresentations). The doctrine has also been extended to provide immunity from tortious-interference claims. *See, e.g., Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 140 (3d Cir. 2005); *Hufsmith v. Weaver*, 817 F.2d 455, 458 (8th Cir. 1987).

Defendants do not dispute that Customs is an administrative agency, nor do they dispute the applicability of *Noerr-Pennington* to Defendants' claims generally. Instead, they offer three reasons why WMH should not enjoy immunity in this particular case: (1) Defendants' damages are based on the actions of WMH *in addition to* the actions of Customs; (2) certain judicial exceptions to the doctrine apply (or at least it is too early to know if those exceptions apply); and (3) the *Noerr-Pennington* doctrine is not applicable to damage claims under 15 U.S.C. § 1120. Each argument is addressed below.

First, Defendants argue that WMH can enjoy no immunity for harm caused by WMH's actions that are unrelated to its petitioning the government. Specifically, Defendants claim that Counterclaims III, IV, V, and VI allege damage due to the continued existence of WMH's '180 mark and that WMH damaged Defendants' goodwill through statements made in the press and to other persons in the industry. (Def. Resp. to WMH Mot. for Summ. J. at 11-12.) But these arguments are not supported by the allegations made in Counterclaims III, IV, V, and VI, each of which seeks only a declaratory judgment invalidating the '180 registration. The *Noerr-Pennington* doctrine provides immunity from claims *for damages*, and it is these claims to which WMH asserts a right to summary judgment based on WMH's assertion of *Noerr-Pennington* immunity.

Defendants' only claims for damages are contained in Counterclaims VIII and IX, both of which allege that the relevant harm was caused by WMH's act of petitioning Customs.

Count VIII alleges tortious interference with prospective economic advantage. Defendants argue that Customs' removal of Defendants' products at the AWFS trade show caused harm to Defendants:

> WMH's actions resulted in a wrongful seizure by [Customs], prevented Woodstock's and Grizzly's customers from viewing Woodstock's and Grizzly's products, and interfered with Woodstock's and Grizzly's prospective business relationships. WMH's actions also irreparably harmed Woodstock's and Grizzly's reputations and their ability to market their products at the Las Vegas trade show. . . . WMH knew that the mere appearance of [Customs] at Woodstock's and Grizzly's trade show booths would result and did result in lost business and business opportunities . . . . [and] WMH knew that prospective business relationships would be lost due to the absence of Woodstock's and Grizzly's woodworking and

24

metalworking equipment that should have been on display throughout the
duration of the trade show.

(Am. Answer, Dkt. No. 86, ¶¶ 43-52.)

In effect, Count VIII alleges that WMH harmed Defendants by filing this suit,
recording its registered trademark with Customs, and requesting that Customs seize
Defendants' goods from the AWFS tradeshow. That is exactly the type of
Constitutionally protected activity that is immune under the *Noerr-Pennington* doctrine.
Unless an issue remains as to whether an exception applies, WMH is thus immune from
liability for any harm alleged in Counterclaim VIII.

Defendants argue that certain exceptions to *Noerr-Pennington* immunity do apply
in this case. Under one such exception, if activity that would otherwise be protected
under the *Noerr-Pennington* doctrine is a "mere sham" to cover an attempt to interfere
directly with the business relationships of a competitor, the doctrine affords no protection
to one engaged in such a sham. *Prof. Real Estate Investors, Inc. v. Columbia Pictures
Indus., Inc.*, 508 U.S. 49 (1993) (*PRE*). Defendants claim WMH's true purpose in
bringing this suit and petitioning Customs was to disrupt Defendants' marketing efforts
with customers and prospective customers.

This "sham exception" is recognized by the Supreme Court and may be
established by a two-part test. *See id.* at 60-61. Under the first prong, the litigation
"must constitute the pursuit of claims so baseless that no reasonable litigant could
realistically expect to secure favorable relief." *Id.* at 60. Only if the lawsuit is
objectively baseless should the court move to the second prong and consider the party's
subjective intent. *Id.* at 60-61. "A 'sham' situation involves a defendant whose activities

25

are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (citations and internal quotation marks omitted).

Here, there is no evidence that WMH did not genuinely seek the relief for which it had petitioned Customs, and Defendants have not shown WMH's petition to Customs to be "so baseless that no reasonable litigant could realistically expect to secure favorable relief." *See PRE*, 508 U.S. at 60. Indeed, the fact that WMH did secure favorable relief from Customs (WMH 56.1(a) ¶ 40) is itself indicative of objective reasonableness. *See Allied Tube & Conduit Co. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988) (observing that a successful "effort to influence governmental action . . . certainly cannot be characterized as a sham"). Nor is the instant suit objectively baseless, as evidenced by Defendants' inability to succeed on their past or present Motions for Summary Judgment.[6]

Defendants also claim that WMH is not entitled to immunity because a so-called "misrepresentation exception" to the *Noerr-Pennington* doctrine should be applied. Although the Supreme Court has reiterated that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process," the Court thus

---

[6] Defendants also argue that it is too early to determine whether WMH is immune under the *Noerr-Pennington* doctrine. But the question is not whether the petitioner's request ultimately proved unsuccessful but whether the request was *objectively baseless*. *See PRE* at 60 n.5 ("[A] court must 'resist the understandable temptation to engage in *post hoc* reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.'") (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-422 (1978)).

far has declined to decide "whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." *PRE*, 508 U.S. at 1929 n.6 (quoting *Cal. Motor*, 404 U.S. at 513). The Supreme Court also noted that other avenues to relief from such harm do exist, citing Federal Rule of Civil Procedure 60(b)(3) and *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965) (*Walker Process*).

Nonetheless, some courts – including the Seventh Circuit – have recognized the possible existence of a "misrepresentation exception" to *Noerr-Pennington* immunity. *See Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 227 (7th Cir. 1975) (*Metro Cable*); *Mercatus Group LLC v. Lake Forest Hosp.*, 528 F. Supp. 2d 797 (N.D. Ill. 2007) (*Mercatus*). But neither *Metro Cable* nor *Mercatus* indicate what level of misrepresentation is required to vitiate otherwise-immune activity. In *Metro Cable* (decided before *PRE*), the Seventh Circuit found that the alleged misrepresentations at issue were made before a political (as opposed to adjudicatory) body and thus did not fall within the prohibitions of the antitrust laws. 516 F.2d at 228. In *Mercatus*, in ruling on a motion to dismiss, the district court held it was "plausible" that the petitioned government body was acting in an adjudicatory capacity and that the alleged misrepresentations "would not necessarily be immunized." 528 F. Supp. 2d at 807. The court never analyzed the specific alleged misrepresentations.

Here, neither side cites any cases applying any so-called "misrepresentation exception" to claims of fraud in procuring a trademark registration. Both generally assume its existence and debate whether Customs was acting as an adjudicatory or

legislative body when it accepted and reviewed WMH's petition. But even if such an exception did apply and Customs was acting as an adjudicatory body, Defendants have not identified any misrepresentation that WMH made to Customs. Instead, Defendants simply argue that the alleged fraud to the PTO should transfer to Customs by virtue of WMH's representing ownership of a valid registered trademark. But a registered trademark is presumptively valid, and Defendants have not identified any evidence that someone at WMH knew the registration to be invalid and misrepresented that fact to Customs.

Because they rely heavily on patent-law cases, Defendants also seem to be arguing that *Walker Process*, which held that one who procures a patent through knowing and willful misrepresentations to the PTO is not immune from liability under the antitrust laws, should be applied in trademark cases. *See* 382 U.S. at 177. But *Walker Process* provides a legal basis for immunity that is separate from the "sham exception" outlined in *PRE*. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (1988) (expressly choosing not to merge *Noerr-Pennington* and *Walker Process* doctrines). The Court is unaware of any case that has applied *Walker Process* to a claim of immunity related to enforcing a trademark, and Defendants have identified none.[7]

---

[7] The only case Defendants identify applying *Walker Process* outside of the patent context is *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 647 (S.D.N.Y. 1992), which applied *Walker Process* in a case alleging fraudulent procurement of a copyright. That court declined to limit *Walker Process* to patent cases because the Supreme Court had stated that the rights of copyright holders are no less than those of patent holders. *Id.* Defendants have not shown the same to be true for the rights of trademark holders.

As such, even if a legal basis exists for a misrepresentation exception in this case, Defendants have not established a factual basis for its application. WMH's Motion for Summary Judgment as to Counterclaim VIII (for tortious interference with a prospective economic advantage) is, therefore, granted.

Finally, Defendants claim the *Noerr-Pennington* doctrine does not apply to claims arising under 15 U.S.C. § 1120 (Counterclaim IX), which provides a cause of action for persons harmed by others' acts of fraud in procuring trademark registrations: "Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."

Although WMH responds with general arguments about Constitutional guarantees trumping statutory damage remedies, "[i]t is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *Cal. Motor*, 404 U.S. at 514 (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)). WMH does not cite any authority specific to the application of the *Noerr-Pennington* doctrine to claims brought under § 1120, and the Court is aware of none. Neither do Defendants cite any authority, but they do raise a good point: "[W]ere a party simply permitted to assert *Noerr-Pennington* against a § 1120 claim, it would effectively allow entities to fraudulently procure federal trademark registrations, and then to enforce these registrations against third parties without any exposure to liability." (Def. Resp. to WMH Mot. for Summ. J. at 12.)

Defendants' point is well taken, and WMH has failed, for purposes of summary judgment, to carry its burden of showing that it should be immune from liability from Defendants' § 1120 claim as a matter of law. WMH's Motion for Summary Judgment as to Counterclaim IX is denied.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is denied in its entirety. WMH's Motion for Summary Judgment is granted as to Defendants' Second Affirmative Defense, Counterclaim II, and Counterclaim VIII. WMH's Motion for Summary Judgment is denied as to Defendants' First, Third, and Eighth Affirmative Defenses and Counterclaims I, III, IX, X, and XI.

Date: December 9, 2009

JOHN W. DARRAH
United States District Court Judge